NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-0963-12T1

FAIRFAX FINANCIAL HOLDINGS
LIMITED and CRUM & FORSTER
HOLDINGS CORP.,

       Plaintiffs-Appellants/
       Cross-Respondents,

    v.

S.A.C. CAPITAL MANAGEMENT, L.L.C.,
S.A.C. CAPITAL ADVISORS, L.L.C.,
S.A.C. CAPITAL ASSOCIATES, L.L.C.,
SIGMA CAPITAL MANAGEMENT, L.L.C.,
STEVEN A. COHEN, ROCKER PARTNERS,
L.P., COPPER RIVER PARTNERS, L.P.,
DAVID ROCKER, THIRD POINT L.L.C.,
DANIEL S. LOEB, JEFFREY PERRY,
INSTITUTIONAL CREDIT PARTNERS, L.L.C.,
WILLIAM GAHAN,[1] JAMES S. CHANOS, and
KYNIKOS ASSOCIATES, L.P.,

       Defendants-Respondents,

    and

EXIS CAPITAL MANAGEMENT, INC.,
EXIS CAPITAL, L.L.C., EXIS
DIFFERENTIAL PARTNERS, L.P., EXIS
INTEGRATED PARTNERS, L.P., ADAM D.
SENDER, ANDREW HELLER, and MORGAN
KEEGAN & COMPANY, INC.,

       Defendants-Respondents/
       Cross-Appellants,

---

> **APPROVED FOR PUBLICATION**
>
> **April 27, 2017**
>
> **APPELLATE DIVISION**

---

[1] Defendants Institutional Credit Partners, L.L.C. and William Gahan entered into a stipulation of dismissal with plaintiffs prior to oral argument.

and

SPYRO CONTOGOURIS, MAX BERNSTEIN,
MI4 INVESTORS, L.L.C., MI4
RECONNAISSANCE, L.L.C., MI4
LIMITED PARTNERSHIP, JOHN D. GWYNN,[2]
and CHRISTOPHER BRETT LAWLESS,

     Defendants.

_____

     Argued October 17, 2016 — Decided April 27, 2017

     Before Judges Fisher, Ostrer and Leone.

     On appeal from the Superior Court of New Jersey, Law Division, Morris County, Docket No. L-2032-06.

     Michael J. Bowe (Kasowitz, Benson, Torres & Friedman, L.L.P.) of the New York bar, admitted pro hac vice, argued the cause for appellants/cross-respondents (Nagel Rice, L.L.P. and Kasowitz, Benson, Torres & Friedman, L.L.P., attorneys; Bruce H. Nagel, Jay J. Rice, Marc E. Kasowitz of the New York bar, admitted pro hac vice, Daniel R. Benson of the New York bar, admitted pro hac vice, and Mr. Bowe, of counsel and on the briefs).

---

[2] Defendant John Gwynn passed away in 2009. He had filed a counterclaim, which alleged defamation, and the absence of a disposition of that claim generated inquiries about finality from this court soon after the appeal was filed. We were advised that a representative of Gwynn's estate had been substituted in his place pursuant to Rule 4:34-1, but that the estate had not appeared in response to the claims asserted against him or to prosecute his counterclaim. A remand to the trial court resulted in the filing of a stipulation of dismissal with prejudice of Gwynn's counterclaim. Gwynn's estate has neither appeared nor taken any part in this appeal.

2

Benjamin P. McCallen (Willkie Farr & Gallagher, L.L.P.) of the New York bar, admitted pro hac vice, argued the cause for respondents S.A.C. Capital Management, L.L.C., S.A.C. Capital Advisors, L.L.C., S.A.C. Capital Associates, L.L.C., Sigma Capital Management, L.L.C. and Steven A. Cohen (Parker Ibrahim & Berg, L.L.C. and Mr. McCallen, attorneys; Joseph T. Boccassini, Martin B. Klotz of the New York bar, admitted pro hac vice, and Scott S. Rose of the New York bar, admitted pro hac vice, on the brief).

Mark S. Werbner (Sayles Werbner, P.C.) of the Texas bar, admitted pro hac vice, argued the cause for respondents/cross-appellants Exis Capital Management, Inc., Exis Capital, L.L.C., Exis Differential Partners, L.P., Exis Integrated Partners, L.P., Adam D. Sender and Andrew Heller (Walder Hayden & Brogan, P.A., and Mr. Werbner, attorneys; Richard A. Sayles of the Texas bar, admitted pro hac vice, Mr. Werbner, Mark D. Strachan of the Texas bar, admitted pro hac vice, and Mark Torian, of the Texas bar, admitted pro hac vice, of counsel; Rebekah R. Conroy and Joseph A. Hayden, Jr., on the brief).

Gavin J. Rooney argued the cause for respondents Copper River Partners, L.P., Rocker Partners, L.P. and David Rocker (Lowenstein Sandler, L.L.P., attorneys; Mr. Rooney, on the brief).

Tibor L. Nagy, Jr., argued the cause for respondents Third Point L.L.C., Daniel S. Loeb and Jeffrey Perry (Tompkins, McGuire, Wachenfeld & Barry, L.L.P. and Matthew S. Dontzin (Dontzin Nagy & Fleissig, L.L.P.) of the New York bar, admitted pro hac vice, attorneys; Mr. Dontzin, Mr. Nagy, and William McGuire, on the brief).

Thomas F. Campion argued the cause for respondent/cross-appellant Morgan Keegan &

Company, Inc. (Greenberg, Traurig, L.L.P.,
Drinker Biddle & Reath, L.L.P., and Bruce W.
Collins (Carrington, Coleman, Sloman &
Blumenthal, L.L.P.) of the Texas bar,
admitted pro hac vice, attorneys; Philip R.
Sellinger, Roger B. Kaplan, Aaron Van
Nostrand, Mr. Collins, Diane M. Sumoski of
the Texas bar, admitted pro hac vice, Todd
A. Murray of the Texas bar, admitted pro hac
vice and Bryan A. Erman, of the Texas bar,
admitted pro hac vice, on the briefs).

Stewart D. Aaron (Arnold & Porter, L.L.P.)
of the New York bar, admitted pro hac vice,
argued the cause for respondents Kynikos
Associates, L.P. and James S. Chanos
(Gibbons, P.C., and Mr. Aaron, attorneys;
Mr. Aaron, Susan L. Shin of the New York
bar, admitted pro hac vice, Joel D. Rohlf of
the New York bar, admitted pro hac vice, and
Marco J. Martemucci of the New York bar,
admitted pro hac vice, of counsel; Brian J.
McMahon and Joshua R. Elias, on the brief).

The opinion of the court was delivered by

FISHER, P.J.A.D.

In describing the adjudication of ostensibly difficult cases, Justice Holmes observed that "when you walk up to the lion and lay hold the hide comes off and the same old donkey of a question of law is underneath."[3] This case's leonine demeanor is well-deserved. Discovery generated millions of pages of documents, the parties conducted more than 150 depositions, the

---

[3] Letter of December 11, 1909 appearing in 1 Holmes-Pollock Letters: The Correspondence of Mr. Justice Holmes and Sir Frederick Pollock 1874-1932, at 156 (Mark DeWolfe Howe ed., 1941).

A-0963-12T1

joint appendix consists of nearly 200,000 pages, and the parties' excellent written submissions — succinct though they are — total nearly 600 pages.[4] Nevertheless, as predicted by Holmes, after grappling with this lion's fearsome hide, we have found not unfamiliar issues lurking beneath. The sheer size of this case and the number of issues, however, has frustrated the normal desire to succinctly describe the implements of decision and, in the final analysis, overwhelmed our preference for brevity. Consequently, we take the unusual step of presenting, for the reader's ease, the following table of contents for this overlength opinion:

**TABLE OF CONTENTS**

I. INTRODUCTION……………………………………………………………………………… 8

II. PLAINTIFFS' STORY ……………………………………………………………………… 9

    A. The Plot Alleged ………………………………………………………………… 10

    B. The Suit At Hand ………………………………………………………………… 21

III. A BRIEF HISTORY OF THE PROCEEDINGS …………………………………… 22

IV. THE ISSUES POSED ……………………………………………………………………… 25

    A. The Viability of the
       Racketeering Claims …………………………………………………………… 26

        1. Plaintiffs' Arguments ………………………………………………… 26

---

[4] So numerous were the filings in the trial court that the clerk was required to assign a second docket number because the court's database was unable to accommodate more than 999 filings within a single docket number.

A-0963-12T1

2. The Judge's Decision ……………………………………… 29

3. Our Holding ……………………………………………………… 34

    (a) Some General Principles ………………………… 35

    (b) <u>Ginsberg</u>'s Impact ………………………………… 36

    (c) New Jersey's
    Racketeering Laws ………………………………… 40

    (d) New York's
    Racketeering Laws ………………………………… 46

    (e) The Choice ……………………………………………… 48

        (i) Legislative Directive ………………… 50

            a. Is There an Express
               Directive? ………………………… 50

            b. Is There an Implied
               Directive? ………………………… 52

        (ii) Application of the
        Second Restatement ……………………………… 56

            a. Section 6 ……………………………… 56

            b. Section 145 ………………………… 61

            c. Specific Tort
               Principles ………………………… 64

        (iii) Conclusion ……………………………………… 72

B. The Maintainability of the
  Common Law Claims ……………………………………………… 73

  1. The Statute of Limitations
     Applicable to Plaintiffs'
     Disparagement Claim ……………………………………… 73

  2. Dismissal of Plaintiffs'
     Disparagement and Tortious

A-0963-12T1

Interference With Prospective Economic Advantage Claims Based on the Absence of Special Damages ............................................. 82

(a) Choice of Law ............................................. 82

(b) Common Law Requirements ............................................. 83

(i) Disparagement ............................................. 83

(ii) Tortious Interference With Prospective Economic Advantage ............................................. 85

(c) Damages Asserted ............................................. 86

3. Summary ............................................. 88

C. The Personal Jurisdiction Rulings ............................................. 89

1. General Jurisdiction ............................................. 91

(a) Kynikos ............................................. 91

(b) Third Point ............................................. 92

2. Specific Jurisdiction ............................................. 95

3. Conspiracy-Based Jurisdiction ............................................. 96

4. Summary ............................................. 112

D. The Summary Judgments In Favor of the SAC Defendants and the Rocker Defendants ............................................. 113

1. The SAC Defendants ............................................. 113

(a) The Parties' Arguments ............................................. 113

(b) The Trial Judge's Ruling ............................................. 115

(c) Our Holding ............................................. 117

2. The Rocker Defendants ............................................. 123

A-0963-12T1

     (a) The Parties' Arguments ………………………… 123

     (b) The Trial Judge's Ruling ………………………… 125

     (c) Our Holding ………………………………………… 128

  E. Lost Profits and the Elson Reports ……………………… 129

    1. General Principles ……………………………………… 132

    2. The Judge's Disposition of
       the In Limine Motion
       Regarding Elson's
       Expert Testimony …………………………………… 133

    3. Our Ruling …………………………………………… 136

V. THE CROSS-APPEALS ………………………………………… 141

  A. Standing ……………………………………………………… 141

  B. First Amendment Grounds ……………………………… 145

    1. The Parties' Arguments …………………………… 145

    2. The Trial Judge's Decision ……………………… 147

    3. Our Holding ………………………………………… 149

V. CONCLUSION ………………………………………………………… 155

APPENDIX ………………………………………………………………… A-1

## I

### INTRODUCTION

In this complex litigation, which was summarily dismissed in many stages over the course of six years, the Canadian and New Jersey plaintiffs asserted, among other things, that defendants — most of whom were located in New York — engaged in

A-0963-12T1

a racketeering enterprise that caused plaintiffs billions of dollars in damages. That claim required a careful consideration of choice-of-law principles because New Jersey recognizes that a plaintiff may maintain a private civil RICO cause of action and New York doesn't. We agree the trial court correctly chose and applied New York law in dismissing the RICO claim. We reject, however, the trial court's determination that plaintiffs' common law causes of action were governed by a New York statute of limitations and hold instead that our own statute of limitations applies; any past uncertainty about that evaporated with the illumination provided by our Supreme Court's recent decision in McCarrell v. Hoffmann-La Roche, Inc., 227 N.J. 569 (2017). We also conclude that New York substantive law applies and limits — but does not eliminate — plaintiffs' common law causes of action. Consequently, we affirm in part, reverse in part, and remand for further proceedings.

## II

### PLAINTIFFS' STORY

Because our Brill[5] standard governed the trial court's disposition of the many issues presented, as it also guides our review, Townsend v. Pierre, 221 N.J. 36, 59 (2015), we examine

[5] Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995).

the disposition of plaintiffs' claims by assuming the truth of their allegations and by giving plaintiffs the benefit of all reasonable inferences. Consequently, our description of the occurrences that triggered this suit are based on plaintiffs' allegations and should not be construed as our acceptance of their truth; in short, we only assume their truth. "I cannot tell how the truth may be; I say the tale as 't was said to me." Sir Walter Scott, The Lay of the Last Minstrel, canto II, st. 22 (1805).

## A. The Plot Alleged

We are told plaintiff Fairfax Financial Holdings Limited (Fairfax) is a Canadian insurance holding company located in Toronto, and Crum & Forster Holdings Corp. (C&F) is a New Jersey corporation headquartered in Morristown. In 1998, Fairfax sought to rescue C&F from failure by purchasing it for hundreds of millions of dollars. C&F's turnaround, however, took longer and proved more difficult than Fairfax originally anticipated. Chief among its difficulties was what plaintiffs have claimed is a "racketeering scheme" designed to "kill" them both.

Plaintiffs assert they were the victims of a "bear raid," by which short-sellers borrow securities, sell them, and then drive the price of that stock down through lies and other forms of market manipulation. See, e.g., Robert G. DeLaMater, Target

10

_Defensive Tactics As Manipulative Under Section 14(e)_, 84 <u>Colum.</u> <u>L. Rev.</u> 228, 244 n.114 (1984). The short-seller then repurchases the shares at the lower price — or not at all if the prey becomes bankrupt and its shares are rendered worthless — and profits from the difference between the higher price at which it sold the borrowed shares and the lower price it pays for the shares it returns to the lender. Because short-selling has its risks — the short-seller must pay interest and post collateral on the borrowed shares that may prove costly — a "short squeeze"[6] quickly causes an increase in the losses suffered.

Plaintiffs claim the short-sellers here were shorted so heavily that the way to a profit and the avoidance of massive losses required that they cause Fairfax to fail. Plaintiffs quote the statements of various defendants that they intended to "kill this company," "crush this company," "drive a stake through that pig Fairfax's heart," and "tak[e] this baby down for the count." Plaintiffs also quote various defendants' statements that the alleged plan involved "get[ting] them where they eat, like the credit [analysts] and [stock] holders" and "stop [their] being able to write biz"; in short, they claim the short-sellers were intent on inflicting "death by a thousand

---

[6] The profitability of a short position fluctuates with changes in the values of the borrowed shares. A sudden increase in the cost of borrowing shares is known as a "short squeeze."

knives" by getting Fairfax's subsidiaries "downgraded" and having C&F go into "runoff," causing a loss of rating and rendering the company "pretty much worthless."

Plaintiffs claim that, so motivated, defendants engaged in a RICO enterprise. See Boyle v. United States, 556 U.S. 938, 948, 129 S. Ct. 2237, 2245, 173 L. Ed. 2d 1265, 1277 (2009) (defining such an enterprise as "a continuing unit that functions with a common purpose" that "need not have a hierarchical structure or a 'chain of command'"). Plaintiffs allege that all defendants were associated in this RICO enterprise, and they described in detail the involvement of the dramatis personae, which we summarize in the following brief way:

- defendant Morgan Keegan & Company, Inc., a registered broker-dealer that provides investment services to hedge funds and others; defendant John Gwynn was a Morgan Keegan analyst. According to plaintiffs, Morgan Keegan disseminated more than sixty materially false and misleading research reports on Fairfax and C&F that were authored by Gwynn, and Morgan Keegan and Gwynn also uttered numerous disparaging communications;

- defendant S.A.C. Capital Management, L.L.C., S.A.C. Capital Advisors, L.L.C., S.A.C. Capital Associates, L.L.C., and Sigma Capital Management, L.L.C., are alleged to be hedge funds controlled by defendant Steven A. Cohen (collectively "the SAC defendants");

12

according to plaintiffs, the SAC defendants engaged defendant Spyro Contogouris on a similar past bear raid of a different company and, according to plaintiffs, similarly engaged him to do the same with plaintiffs. The SAC defendants were the largest investors in the Exis defendants[7] and non-party Bridger Capital Management, which both possessed an economic interest in the alleged scheme.

- Contogouris was, according to plaintiffs, an enterprise operative who posed as an independent research analyst and disseminated disinformation, instigated a Securities & Exchange Commission investigation, and generated negative news stories about plaintiffs[8] via the so-called "MI4" reports.[9]

- The Exis defendants were alleged to be hedge funds that secured a substantial short position in Fairfax. They and their chief executive and chief operating officers, defendants Adam D. Sender and Andrew Heller, respectively, were alleged to have maintained the closest relationship with Contogouris; they allegedly provided him with office

---

[7] Namely, Exis Capital Management, Inc., Exis Capital, L.L.C., Exis Differential Partners, L.P., and Exis Integrated Partners, L.P.

[8] Adding to the drama, plaintiffs allege Contogouris acted through the use of aliases, such as "Monsieur Skaramanga," a James Bond villain.

[9] The names of these reports refer to defendants MI4 Limited Partnership, MI4 Reconnaissance L.L.C., and MI4 Investors, L.L.C. (the MI4 defendants), all entities controlled by Contogouris.

A-0963-12T1

space, assistants and a most substantial compensation package.

- defendants Rocker Partners, L.P., and Copper River Partners, L.P., are alleged to be hedge funds based in Millburn primarily owned and managed by defendant David Rocker (collectively, the Rocker defendants); according to plaintiffs, the Rocker defendants worked closely with defendant Kynikos Associates, L.P., Morgan Keegan and other members of the alleged enterprise in shorting Fairfax at the scheme's inception.

- defendant Institutional Credit Partners, L.L.C. (ICP) is a financial firm alleged to have paid and worked closely with Contogouris, and to have traded in advance of negative events allegedly generated by Contogouris. According to plaintiffs, ICP directly disseminated false claims about them; ICP employees are alleged to have worn surgical gloves to avoid leaving fingerprints on materials they transmitted, and William Gahan, an ICP credit analyst, obtained the bail bond that secured Contogouris's release after he was arrested by the Federal Bureau of Investigation on an unrelated fraud charge months after this suit was filed.

- defendant Kynikos Associates, L.P. — a limited partnership organized in 1985 in Delaware with its principal place of business in New York — is an investment advisor and management company specializing in short-selling; it has managed over $1 billion for its clients. Plaintiffs alleged that Kynikos and its founder and president, James S. Chanos, participated in the enterprise in that they worked closely with other defendants, including Contogouris.

A-0963-12T1

- defendant Christopher Brett Lawless, a New Jersey resident, worked as a research analyst for Fitch Ratings in New York City and for the Center for Financial Research and Analysis in Maryland. Lawless allegedly tutored Contogouris to enable him to pose as a research analyst and thereafter continued to collaborate with Morgan Keegan, Contogouris and those paying Contogouris.

- defendants Third Point, L.L.C., is an investment management firm created under the laws of Delaware and headquartered in New York. During the times in question, Third Point provided management services to several investment funds that traded in Fairfax securities. Defendant Daniel S. Loeb is the founder and managing member of Third Point, and defendant Jeffrey Perry was a senior analyst.

According to plaintiffs, in 2002, the SAC defendants, Kynikos, the Rocker defendants, and others, were collaborating and either aggressively shorting or preparing to short Fairfax. Plaintiffs claim that C&F had begun to favorably turn its position around at that time, so defendants' enterprise sought a "negative catalyst" to drive down C&F's price, and the enterprise began to "educate[] rating agencies and other research analysts about their negative views."

On December 18, 2002, the day after deciding to cover their position, the SAC defendants learned that Gwynn of Morgan Keegan was about to issue a report that Fairfax and its subsidiaries

15

were under-reserved by billions of dollars and effectively insolvent. Gwynn tipped off Kynikos and faxed an outline of the issues. Upon receiving this tip, the SAC defendants began communicating directly with Gwynn, and Kynikos and Third Point thereafter traded in advance of the report based on the tipped information.[10]

Morgan Keegan published its report on January 17, 2003. Plaintiffs allege that Morgan Keegan falsely claimed that Fairfax had overstated its equity by more than $5 billion and that Morgan Keegan's alleged false claim devastated Fairfax's stock price, which fell thirteen percent in one day and further in the days that followed. Two weeks later, Morgan Keegan issued a second report acknowledging it "possibly" double-counted $2 billion in purported subsidiary liabilities, including at C&F. As a result, the stock price recovered somewhat but remained down.

---

[10] Plaintiffs claim that Kynikos re-shorted over $5 million in shares just before the first report. And, after not shorting for four months, Third Point sold short $1,500,000 in shares the day before publication. The SAC defendants did not cover its short positions by year-end as originally planned but completed their cover after the report was issued and the stock price dropped sharply. Plaintiffs assert that many of the trades involving these and other parties or accounts controlled by the enterprise members violated insider-trading laws and support their RICO claim.

A-0963-12T1

According to plaintiffs, enterprise members traded heavily on Morgan Keegan's tips concerning its initial report. In exchange, Morgan Keegan benefited from these tips by way of commissions through referred trades, and with the expectation of greater future benefits. According to plaintiffs, Morgan Keegan understood their big payoff — what a Morgan analyist referred to as "our 7-8 digit trade!!" — would come when Fairfax's "stock goes to zero." Consequently, for the next four years, Morgan Keegan published more than sixty research reports that portrayed plaintiffs and their affiliates as "an insolvent, Enron-like fraud[]"; this disinformation was, according to plaintiffs, orchestrated, and Morgan Keegan was urged to make sure its reports were "really negative." Morgan Keegan communicated in other ways that Fairfax and its executives were "crook[s]" and "felons" who manipulated financial information to "mak[e] it look like they have a profit." Plaintiffs claim Morgan Keegan knew of the falsity of its disseminated statements.

Plaintiffs allege that, despite the inflicted harm, their turnaround was progressing, causing defendants' enterprise to either quit its position at a loss or increase the short position and intensify their efforts. Information amassed in the joint appendix evokes scenes from Oliver Stone's 1987 film, <u>Wall Street</u>. One hedge fund manager — defendant Adam Sender, who was

affiliated with the Exis defendants — explained to Contogouris that he "want[ed] [Prem Watsa's[11]] head in a box," and another viewed the dissemination of negative reports as the equivalent of needing to "keep . . . this gun loaded with bullets" and "eventually this pig will roll over and die." Meanwhile, to add content to the negative reports, Morgan Keegan allegedly fed Contogouris with the false claims that: Fairfax was disguising billions in debt as reinsurance; Fairfax was turning its investment subsidiaries — with the use of "[s]moke and [m]irrors" — into "an illegal enterprise"; and that Watsa was "transferring his personal holdings into asset protection schemes that he thinks will be safe from regulators."

Over the course of nearly two years, Contogouris — allegedly at the direction and with the support of Morgan Keegan, Lawless, the Exis defendants, Third Point and Kynikos — disseminated false claims to the FBI, federal prosecutors, the SEC, the media, ratings agencies, research analysts and investors, that Fairfax was engaged in an Enron-like fraud.[12] In June 2005, the SAC defendants re-shorted Fairfax — a month after

---

[11] Watsa is Fairfax's chairman and chief executive officer.

[12] Contogouris anonymously created a website called Premwatsa.com, which compared Fairfax to the disgraced Enron and Watsa to Enron's CEO, Kenneth Lay. Much has been written about the Enron debacle. See, e.g., Kurt Eichenwald, Conspiracy of Fools: A True Story (2005).

Contogouris's approach to the FBI that resulted in the service of SEC subpoenas on Fairfax in September 2005. Three weeks earlier, the investors of Exis, of which SAC was the largest, were tipped off that "subpoenas from the regulators . . . should be announced in the next three weeks." The Exis defendants and the SAC defendants increased their short positions in advance of the subpoenas.

Plaintiffs further allege, and refer to the voluminous record in support, that Contogouris provided false and negative information to various media and targeted as part of this campaign: investors, institutions and research analysts; rating agencies[13]; Fairfax executives and staff[14]; and even to Watsa's parish pastor.[15] Contogouris allegedly made harassing telephone calls to Watsa's home and office at night to "rattle his cage." Plaintiffs assert that Contogouris kept Morgan Keegan and Lawless advised of his activities, and Morgan Keegan reported these activities to other enterprise members.

---

[13] Contogouris sent his FraudFacts report to Standard & Poor's and A.M. Best.

[14] Plaintiffs allege that Contogouris sent, through the use of aliases, threatening emails to Watsa's staff in an effort to find "a way in" via a staff member willing to be a mole.

[15] Contogouris allegedly sent information to Watsa's parish pastor, warning that Watsa, who handled the church's investment fund, might defraud the church.

According to plaintiffs, the enterprise members learned during the Summer of 2006 that the FBI and federal prosecutors intended to expand their investigation into Fairfax in light of Contogouris' disseminations, and they also learned that The New York Post was about to publish a series of negative stories. Contogouris used code in communicating this information to enterprise members, referring to the FBI as the "meteorologist," The New York Post reporter as the "Postman," and what he expected to imminently occur as the "Hurricane," which was due in August. Sender encouraged others to short the stock and the SAC defendants, which allegedly were in contact with Sender and Contogouris "all the time" during this period, increased their short position in June 2006. To fuel the flames, rumors were allegedly spread on June 22 and 23, 2006, that Watsa had transferred his assets into his wife's name and that he fled the country as the Royal Canadian Mounted Police raided Fairfax's offices.

The day after these rumors started, the Exis defendants rewarded Morgan Keegan with substantial trading business. Fairfax's stock price plummeted for two days before Fairfax issued a statement debunking the rumors.

## B. The Suit At Hand

Plaintiffs commenced this lawsuit on July 26, 2006. Their complaint was filed just before what they allege were to be the final steps in the enterprise's scheme but not before they allegedly suffered significant monetary damages. Plaintiffs claim Fairfax suffered damages to its assets and equity, as well as those of its subsidiaries, in the billions of dollars.[16]

Particularly relevant in light of the issues on appeal, plaintiffs claim C&F incurred a loss of nearly $1 billion, including: (1) approximately $200,000,000 in capital costs and interest incurred in and paid from New Jersey in the form of having to raise capital not otherwise needed; (2) lost profits estimated at $545,000,000; and (3) increased costs and expenses in the form of higher directors and officers (D&O) insurance premiums with far less coverage, and greater legal, accounting,

---

[16] The parties even dispute the purpose of this suit. Morgan Keegan contends that Fairfax has been a "troubled company for years," and launched, as part of a "public relations campaign," this "sensational" RICO suit, claiming $6 billion in compensatory damages, which, if trebled as permitted by New Jersey law, would result in "a headline-grabbing $18 billion," caused by "a veritable cabal of short sellers and research analysts bent on destroying the company" for their own profit. The matter having come before us by way of summary rulings in favor of all defendants, we place no reliance on Morgan Keegan's argument about the motivation of this suit and assume, without deciding, the bona fides of plaintiffs' claims.

and administrative costs to deal with the enterprise's alleged wrongful actions.

## III

## A BRIEF HISTORY
## OF THE PROCEEDINGS

As mentioned, plaintiffs commenced this action in 2006. A second amended complaint was filed in 2007 and a third in 2008. Plaintiffs alleged defendants' manipulations violated New Jersey's RICO statute and gave rise to several common law claims, specifically commercial or product disparagement, tortious interference with prospective economic advantage, tortious interference with contractual relationships, and civil conspiracy.

On July 11, 2008, the Rocker defendants moved for summary judgment, asserting that insufficient evidence existed to establish that it participated in the alleged conspiracy. The judge then presiding over the matter[17] granted, on September 25, 2008, the Rocker defendants' application, but did so without prejudice.

---

[17] Numerous judges presided over this leviathan of a case during its long life in the trial court. To avoid confusion, we make no attempt to distinguish which of the able judges ruled on which motion. Regardless of the outcome of the many issues raised, we commend all these judges for their efforts.

On May 5, 2011, the SAC defendants sought summary judgment on grounds substantially similar to those that the Rocker defendants had successfully advanced, namely, that there was insufficient evidence to demonstrate the SAC defendants' participation in the alleged scheme against plaintiffs. On September 12, 2011, the court granted the SAC defendants' motion for summary judgment.

Meanwhile, Kynikos moved for summary judgment, claiming our courts could not assert personal jurisdiction over it. Third Point and ICP also moved for summary judgment on the same or similar grounds. Kynikos and Third Point also sought a choice-of-law determination, arguing New York law both governed plaintiffs' conspiracy claims and required a dismissal of plaintiffs' RICO claims. And, in the same period of time, the Rocker defendants sought a determination that the September 25, 2008 grant of summary judgment "without prejudice" be converted to a dismissal "with prejudice."

On December 23, 2011, the court granted the Rocker defendants' application to convert its prior determination to summary judgment with prejudice and dismissed the third amended complaint against Kynikos, Third Point and ICP for lack of personal jurisdiction.

Many more motions followed.

On April 13, 2012, Morgan Keegan, Lawless, the Exis defendants and the MI4 defendants filed a consolidated motion for summary judgment with respect to all the common law claims plaintiffs had asserted against them.[18] And, on April 20, 2012, plaintiffs cross-moved for reconsideration of the court's prior dismissal of the Rocker defendants with prejudice.

On May 11, 2012, the trial court granted partial summary judgment in favor of Lawless. Finding New York law governed plaintiffs' racketeering allegations, the trial court dismissed plaintiffs' RICO claims. And plaintiffs' reconsideration motion of the with-prejudice dismissal of the claims against the Rocker defendants was denied.

In June 2012, the trial court heard and summarily dismissed plaintiffs' claim of tortious interference with prospective economic advantage but sustained plaintiffs' remaining common law claims.

Also in June 2012, Morgan Keegan moved for partial summary judgment, seeking dismissal of plaintiffs' disparagement claim based on its alleged untimeliness; the motion was denied in August 2012. Later that month, the judge denied plaintiffs' request to reconsider its ruling that New York law controlled

---

[18] Namely, tortious interference with contractual relationships, tortious interference with prospective economic advantage, and civil conspiracy.

plaintiffs' racketeering and conspiracy claims. The judge also granted Morgan Keegan's application for reconsideration of the denial of summary judgment on the tortious-interference-with-contract claim but rejected Morgan Keegan's assertion that a one-year statute of limitations applied to plaintiffs' disparagement claim.

On September 5, 2012, plaintiffs stipulated to the dismissal of Lawless without prejudice. On September 11, 2012, in accordance with a partial settlement agreement, the judge signed a consent order, which dismissed without prejudice plaintiffs' claims against Contogouris and the MI4 defendants. And, on September 12, 2012, the judge entered final judgment dismissing the entirety of the remainder of plaintiffs' third amended complaint, finding "a complete absence of proof" of proximately-caused damages.

Plaintiffs filed a notice of appeal. Cross-appeals were also asserted.

## IV

### THE ISSUES POSED

In appealing the summary dismissal of its causes of action, plaintiffs argue the trial court erred: (a) in dismissing their RICO claims by applying New York rather than New Jersey law; (b) in dismissing certain of their common law claims by applying New

York's statute of limitations rather than New Jersey's; (c) in dismissing the claims against Kynikos, Third Point and the ICP defendants[19] for lack of personal jurisdiction; (d) in granting summary judgment in favor of both the SAC defendants and the Rocker defendants; and (e) in excluding the expert opinion of Craig Elson on damages that plaintiffs intended to elicit at trial, thereby shutting the door on any trial at all.

## A. The Viability of The Racketeering Claims

In reviewing the disposition based on the trial court's application of choice-of-law principles, we describe (1) the parties' arguments and (2) the judge's decision, and then express (3) our agreement with the trial court's disposition of the RICO claim.

## 1. Plaintiffs' Arguments

Plaintiffs claim the trial court erred by dismissing their RICO claims through application of New York law. Indeed, they argue that choice-of-law questions do not even arise when a matter falls within the intended scope of a New Jersey statute; that is, they claim our Legislature intended to provide a remedy

---

[19] As noted earlier, plaintiffs and the ICP defendants resolved their differences shortly before oral argument took place in this court.

for every New Jersey domiciliary harmed by a RICO violation, which the law defines as harm arising from conduct of a prohibited kind that satisfies the enactment's territorial predicates, with no distinction between criminal and private prosecutions. And they argue there was sufficient conduct by defendants that either occurred within or had a sufficient effect in New Jersey to satisfy the statute, even apart from the conspiracy, which by itself — in their view — involved enough activity within New Jersey to satisfy the Criminal Code's definition of such an offense.

Plaintiffs argue further that the court had no basis for "inventing" or "importing" common law principles to impose the territorial limitations on jurisdiction over traditional torts, noting that the limitations were not included in either the RICO statute or in the Criminal Code's general territoriality statute. On the contrary, they claim the Legislature has specified that the RICO provisions for civil remedies must be liberally construed to affect that enactment's remedial purpose and that all remedies be cumulative to one another and to other remedies at law.

In addition, plaintiffs argue that the trial judge erred by failing to recognize there was no policy conflict between New Jersey and New York law because both states' enactments "provide

27

civil remedies to deter and compensate for" the same proscribed conduct. And they argue New Jersey's allowance of private civil remedies does not constitute a different approach toward the shared goal of deterring racketeering, "only a different judgment about how best to use each state's judicial system to do so." Although both states seek to vindicate the same policies, plaintiffs argue New Jersey's broader remedies made it the better vehicle for achieving that goal, and thus the correct law to apply.

Plaintiffs contend further that, even if New Jersey and New York law generated a true conflict, section 6 of the Restatement (Second) of Conflict of Laws (1971) (Am. Law Inst., amended 1988),[20] provided an independent basis for applying New Jersey law to the RICO claims. They assert section 6 warranted application of New Jersey law due to this State's interest in protecting C&F, which sustained injuries at its New Jersey headquarters, and because New Jersey had an interest in protecting other in-state businesses, such as the rating agencies and business news organizations that the enterprise is

---

[20] Our many references to the Restatement (Second) of Conflict of Laws shall hereafter in the text be "Second Restatement" and in citations be "Restatement (Second)," with reference to a specific section or comment. To avoid confusion, we will provide greater specificity when referring to the Restatements dealing with torts and contracts that are cited as well.

alleged to have deliberately misled in order to promote their scheme. Plaintiffs contend they reasonably expected the protection of New Jersey law to the extent of their business affecting this State, whereas defendants had no expectation that their misconduct would be any less violative of New York law than it would of New Jersey law. In addition, they contend that failing to apply New Jersey's RICO statute as intended would inject an unanticipated and unneeded balancing test between New Jersey law and out-of-state law.

Finally, plaintiffs argue that the Second Restatement's section 145 standards favored application of New Jersey law due to the predominance of this case's contacts with New Jersey. They call New Jersey the situs of "the injury" because C&F had its domicile and principal place of business here, and they note that several enterprise members were New Jersey residents or engaged in enterprise activity within the State.

## 2. The Judge's Decision

In May 2012, the trial judge determined that New York's local law — that is, the law that applied within New York before any consideration of choice-of-law principles[21] — applied to the

---

[21] The judge's definition of "the local law" accords with the Second Restatement, which describes "the local law" as the law that would apply if all parties and relevant events were within

(continued)

RICO claims and, accordingly, compelled the entry of summary judgment in defendants' favor. He first found an actual conflict existed — because New Jersey recognizes a private civil RICO action and New York doesn't — and observed that a statutory mandate for New Jersey jurisdiction over private civil claims would have precluded a choice-of-law analysis here, but then found no such mandate existed. The judge explained that RICO's own territoriality provision was expressly limited to criminal cases, and that the Legislature did not intend civil RICO claims to have the same jurisdictional reach or to be exempt from the "accepted, traditional common law principles of jurisdiction" for civil claims, which included application of choice-of-law principles.

The trial judge recognized that the first step in a choice-of-law analysis was to determine whether any state was presumed to satisfy the Second Restatement's most fundamental touchstone of being the state with "the most significant relationship" to the matter and found that, though choice-of-law principles might deem C&F's loss of customers to have been an injury sustained in

_____

(continued)
one state, without application of that state's choice-of-law rules. Restatement (Second), supra, § 145 cmt. h and § 4. In this context, a reference to "state law" without qualification means the entire body of a state's law, including its choice-of-law rules. Ibid.

New Jersey, it was "improper" to presume New Jersey jurisdiction on that basis, because C&F was "a minor player in this matter," there was a "complex interrelationship between [the] plaintiffs," and the RICO allegations here were broader and more complex than a particular injury to one subsidiary.

According to the trial judge, the "most direct consequence" of the alleged RICO enterprise was to decrease the market prices of plaintiffs' securities, a claim for which Fairfax was the "lead" plaintiff. All the other alleged injuries caused by the enterprise, namely, the increase in "capital costs," the costs of responding to the SEC investigation, and the increased legal and accounting costs, "were a consequence of that deflation." The "most direct" injury and its derivatives arose from the alleged enterprise activity that involved the financial markets and financial news media and, as the judge observed, "[t]he financial markets, the news media and the parties are clearly based predominantly in New York." Accordingly, the New Jersey connections to the RICO claims — namely, the domiciles of C&F, A.M. Best,[22] and Lawless — did not suffice to give New Jersey the "most significant relationships" to a RICO enterprise as broad

---

[22] A.M. Best is a major rating company headquartered in New Jersey.

and complex as alleged. Consequently, the trial judge found that New York's local law presumptively applied.

As for the other section 145 factors, the judge found that the "vast majority" of the alleged misconduct manifestly occurred in New York and only a fraction was committed by Lawless, the one defendant located in New Jersey. The judge determined that all other enterprise members were domiciled or incorporated elsewhere and conducted their activities elsewhere, and, also, that the enterprise members did not have a prior relationship, much less one centered in New Jersey. Furthermore, Fairfax and its other main United States operating Odyssey subsidiaries,[23] were domiciled or incorporated elsewhere and operated outside New Jersey. Accordingly, even if the decrease in the price of C&F securities was deemed a direct injury to C&F, as opposed to a derivative injury largely arising from its exposure to Fairfax's troubles, "the place where the injury occurred," as defined by section 145(2)(a) of the Second Restatement, was nonetheless in New York's financial markets, and the enterprise members had "minimal contact with New Jersey" in causing it.

---

[23] What we refer to as Odyssey consists of: Odyssey Re Holding Corp., which was incorporated in Delaware and had principal executive offices in New York; wholly-owned Odyssey Re Group; and Odyssey America Reinsurance Corp., which had its principal offices in Connecticut.

The trial judge then turned to the general choice-of-law principles set out in section 6 of the Second Restatement. For comity's sake, he explained that, although New York and New Jersey had competing interests about whether private actors should be able to enforce a RICO statute, the two states' enactments were nonetheless similar and shared the "fundamental policies" of preventing racketeering and other organized crime. The two states' policies were therefore not in fundamental conflict, so interstate comity required New Jersey to respect New York's deliberate decision about how to serve that policy that included a decision to withhold a private RICO cause of action. The judge found that was also true from the perspective of "[t]hose involved in the financial markets based in New York" because they "should be able to depend on New York law" as the law governing "their conduct."

As for the interests of the parties and the interests underlying the field of tort law, the judge observed that the parties knew New York law precluded exposure to private RICO claims regardless of their conduct. And, because New York had the "most significant relationship" to the matter, defendants had "no reasonable expectation" that such exposure could arise due to the application of another state's local law. The judge reasoned the result should not change just because the conduct,

33

which was focused on "the New York financial industry," also had tangential connections outside that state, such as the communications with A.M. Best, the one major rating agency located in New Jersey.

The trial judge also observed that the only factor favoring application of New Jersey law instead of New York law was the greater involvement in this litigation of New Jersey's courts. He noted, however, that this factor did not outweigh the need to serve the choice-of-law "values," which were "certainty, predictability and uniformity of results" in their application. Consequently, the judge ruled that the "qualitative balance" of all the section 145 and section 6 factors of the Second Restatement compelled application of New York local law, which, upon application, compelled dismissal of the RICO claims.

### 3. Our Holding

For the reasons that follow, we conclude that New York law, which does not permit a private civil racketeering action, applies in this case and, as held by the trial court, requires the dismissal of plaintiffs' RICO claim.

We first consider (a) some general principles, as well as (b) the impact of the Supreme Court's recent decision in Ginsberg v. Quest Diagnostics, Inc., 227 N.J. 7, 18 (2016), on the issues raised. Then, because an early but pivotal step in

resolving a choice-of-law problem requires a determination that a true conflict exists, we examine (c) New Jersey's racketeering laws, and their intent and purposes, and we thereafter similarly analyze (d) New York's racketeering laws. We then conclude this part of the opinion with a description of (e) the choice of law required in these circumstances.

### (a) Some General Principles

In considering the propriety of the choice-of-law determinations in question, we observe, first, that the trial judge's interpretation of the RICO statutes is not entitled to deference. ADS Assocs. Grp., Inc. v. Oritani Sav. Bank, 219 N.J. 496, 511 (2014). Choice-of-law determinations present legal questions, which are subjected to de novo review. Bondi v. Citigroup, Inc., 423 N.J. Super. 377, 418 (App. Div. 2011), certif. denied, 210 N.J. 478 (2012); Arias v. Figueroa, 395 N.J. Super. 623, 627 (App. Div.), certif. denied, 193 N.J. 223 (2007). And choice-of-law decisions are made not only issue-by-issue, Cornett v. Johnson & Johnson, 211 N.J. 362, 374 (2012), but also, at times, party-by-party, Ginsberg, supra, 227 N.J. at 18.

When New Jersey is the forum state, its choice-of-law rules control. McCarrell, supra, 227 N.J. at 588; Erny v. Estate of Merola, 171 N.J. 86, 94 (2002). For tort claims, our Supreme

Court has expressly embraced the Second Restatement for choice-of-law determinations. P.V. ex rel. T.V. v. Camp Jaycee, 197 N.J. 132, 139-43 (2008).

New Jersey courts have also recognized that a parent corporation may have standing to participate in litigation over wrongs sustained by its subsidiary if the parent itself has a sufficient financial interest in the outcome. See, e.g., Bondi, supra, 423 N.J. Super. at 436-39. See also Section V(A), infra. Bondi did not declare a categorical rule that the same jurisdiction's local law always applies to both the parent and the subsidiary with regard to a particular claim, and, at the time the trial judge ruled, neither Bondi nor any other reported New Jersey opinion had suggested a general reason not to adopt such a rule.

### (b) Ginsberg's Impact

Recently, our Supreme Court recognized that, in multi-party actions, choice-of-law principles may call for the application of a different state's laws from party-to-party or claim-to-claim. Ginsberg, supra, 227 N.J. at 18.[24] But plaintiffs have

---

[24] To be precise, Ginsberg specifically held that "in the majority of cases, a defendant-by-defendant analysis furthers the [Second] Restatement principles and provides the most equitable method of resolving choice-of-law questions." 227 N.J. at 18 (emphasis added). But, in explaining this aspect of its

(continued)

never sought separate choice-of-law analyses. In fact, plaintiffs have blurred the distinctions between them and their subsidiaries, perhaps for strategic reasons,[25] thereby frustrating any attempt at rendering an informed, individualized, choice-of-law analysis from each plaintiff's standpoint.

That is, we recognize that in many instances in which multiple claims are asserted by multiple plaintiffs against multiple defendants, a court may be asked to make individualized choice-of-law determinations that "exponentially" increase in difficulty with every increase in the number of parties and claims. See Georgine v. Amchem Products, Inc., 83 F.3d 610, 627 (3d Cir. 1996). We do not think, however, that where two or more related corporate plaintiffs file a single action based on the

_____

(continued)
holding, the Court observed that Second Restatement principles "focus[] on the state's relationship to the parties," and recognized that, in referring to "parties," the Second Restatement was not limited and included plaintiffs, defendants, and "any third party defendants." Ibid. (emphasis added). Consequently, we do not view Ginsberg's particular holding, which required in some instances a "defendant-by-defendant analysis," as applying only in that circumstance. Instead, the same principles may at times warrant plaintiff-by-plaintiff analyses as well.

[25] For example, if it had pursued its claims separately from C&F's, Fairfax would have had no plausible argument for applying New Jersey substantive law to a dispute between a Canadian corporation based in Toronto and various New York-based defendants.

37                                                            A-0963-12T1

same operative set of facts, and assert causes of action and demands for damages allegedly caused to their corporate family — as if that family constituted a single entity — that a court must nevertheless disentangle all the possibilities in identifying the correct state law to be applied to each plaintiff's claim or claims. Ginsberg does not require that a court make such determinations when the court is deprived of the parties' assistance. In short, since plaintiffs do not seek a separate resolution of each choice-of-law problem from each of their standpoints, we will not pursue that possibility further. We would add that to the extent multiple plaintiffs would have a court treat them differently for choice-of-law purposes, they must come forward and make that argument[26] and, moreover, be

---

[26] We do not interpret our rules as requiring a plaintiff or plaintiffs to affirmatively plead the application of another jurisdiction's laws; indeed, we have shown particular liberality in allowing defendants to assert another jurisdiction's laws in moving for summary judgment even when not having first asserted that other jurisdiction's law as an affirmative defense. See Rowe v. Hoffman-La Roche Inc., 383 N.J. Super. 442, 450-51 (App. Div. 2006), rev'd on other grounds, 189 N.J. 615 (2007); Erny v. Russo, 333 N.J. Super. 88, 96 (App. Div. 2000), rev'd on other grounds, 171 N.J. 86 (2002). But that liberality is stretched beyond breaking if we were to allow a party to advocate on appeal, for the first time, an entirely different approach to already difficult choice-of-law questions. As we said in our decision in Ginsberg, which the Supreme Court affirmed, "choice-of-law determination[s] ideally should be made as early in a case as possible." Ginsberg v. Quest Diagnostics, Inc., 441 N.J. Super. 198, 223 (App. Div. 2015); see also Bailey v. Wyeth, Inc., 422 N.J. Super. 343, 350 (Law Div. 2008), aff'd on other
(continued)

38                                                         A-0963-12T1

willing to be treated separately for all other purposes as well.[27]

In the final analysis, Ginsberg not only held that an individualized assessment is "not feasible in every matter," 227 N.J. at 20, but also that, in each case, a court must ascertain "the most equitable method of resolving choice-of-law questions," Id. at 18. A sudden alteration in course — sought by no one here, even now on appeal — that might arguably be

_____

(continued)

grounds, 433 N.J. Super. 360 (App. Div. 2011), certif. denied, 211 N.J. 274 (2012). And it is well-established in the federal courts that choice-of-law issues may be waived when not asserted by the parties, Williams v. BASF Catalysts LLC, 765 F.3d 306, 316-17 (3d Cir. 2014), a concept that we hold should be applied here as well. Having said all that, we do not mean to suggest that plaintiffs have sought a sudden change in course; to the contrary, even after both our decision and the Supreme Court's decision in Ginsberg, plaintiffs have continued to pursue their rights as if they were the same juridical creature and have not sought an individualized choice-of-law assessment from each plaintiff's standpoint. Consequently, we hold that in light of the arguments plaintiffs have posed, and in consideration of their suggestions as to how we are to exit this choice-of-law labyrinth, we should not now pursue a wholly different path that plaintiffs — even in the wake of Ginsberg — have never urged as the proper or required course.

[27] When multiple plaintiffs seek individualized choice-of-law determinations, we would think concerns about standing, such as those raised here, would warrant a less liberal approach than suggested by Bondi, supra, 423 N.J. Super. at 436-39, which we discussed above and again later in this opinion. In short, a court should not be expected to choose the law appropriate for each plaintiff as to each claim, only to have, for example, plaintiff X lay claim to a right to pursue an award of damages based on injuries sustained by plaintiff Y.

permitted by <u>Ginsberg</u>, does not serve our chief, overarching goal of seeking an equitable method for resolving the parties' choice-of-law disputes.

### (c) New Jersey's Racketeering Laws

In enacting anti-racketeering legislation, <u>N.J.S.A.</u> 2C:41-1 to -6.2,[28] the Legislature utilized federal statutes as its model. Accordingly, federal case law provides a useful guide in understanding our own RICO law. <u>Cagno</u>, <u>supra</u>, 211 <u>N.J.</u> at 508. In this regard, it is noteworthy that the federal and New Jersey enactments expressly afford a private civil cause of action, <u>see</u> 18 <u>U.S.C.A.</u> § 1964(c); <u>N.J.S.A.</u> 2C:41-4(c), whereas New York's similar law, which we discuss in Section IV(A)(3)(d), <u>infra</u>, does not. The New Jersey and federal enactments allow "[a]ny person," who is injured "in his business or property by reason of a violation" of the statute, to "sue therefore" and recover treble damages, plus costs of suit including a reasonable attorney's fee. 18 <u>U.S.C.A.</u> § 1964(c); <u>N.J.S.A.</u> 2C:41-4(c).

All remedies permitted by our RICO law are "cumulative with each other and other remedies at law," <u>N.J.S.A.</u> 2C:41-6.1, and

---

[28] Better known as our RICO law. <u>State v. Cagno</u>, 211 <u>N.J.</u> 488, 508 (2012), <u>cert. denied</u>, ___ <u>U.S.</u> ___, 133 <u>S. Ct.</u> 877, 184 <u>L. Ed.</u> 2d 687 (2013); <u>State v. Ball</u>, 268 <u>N.J. Super.</u> 72, 98 (App. Div. 1993), <u>aff'd</u>, 141 <u>N.J.</u> 142 (1995), <u>cert. denied</u>, 516 <u>U.S.</u> 1075, 116 <u>S. Ct.</u> 779, 133 <u>L. Ed.</u> 2d 731 (1996).

A-0963-12T1

the Legislature has instructed that our RICO law must be "liberally construed to effect [its] remedial purposes," <u>N.J.S.A.</u> 2C:41-6.

The required "racketeering activity," also known as a predicate act, must itself be a criminal offense. <u>N.J.S.A.</u> 2C:41-1(a)(1), (2); <u>Ball</u>, <u>supra</u>, 141 <u>N.J.</u> at 162; <u>Karo Mktg. Corp. v. Playdrome Am.</u>, 331 <u>N.J. Super.</u> 430, 438 (App. Div.), <u>certif. denied</u>, 165 <u>N.J.</u> 603 (2000). In fact, the predicate act may not only be one of the crimes the Legislature has identified but also an "equivalent crime" under the law of "any other jurisdiction," <u>N.J.S.A.</u> 2C:41-1(a).

A "pattern of racketeering activity" requires two predicate acts, <u>N.J.S.A.</u> 2C:41-1(d)(1), that have "either the same or similar purposes, results, participants or victims or methods of commission or are otherwise interrelated by distinguishing characteristics and are not isolated incidents," <u>N.J.S.A.</u> 2C:41-1(d)(2). Participation in a conspiracy to commit prohibited RICO activity is also prohibited activity. <u>N.J.S.A.</u> 2C:41-2(d). The designation of conspiracy as racketeering activity under federal law means that the conspiracy itself may be one of the required predicate acts. <u>State v. Bisaccia</u>, 319 <u>N.J. Super.</u> 1, 20-21 (App. Div. 1999). In a private civil RICO action, the predicate act must be the proximate cause of the plaintiff's injury.

Interchange State Bank v. Veglia, 286 N.J. Super. 164, 178 (App. Div. 1995) (citing Holmes v. Sec. Inv'r Prot. Corp., 503 U.S. 258, 265, 112 S. Ct. 1311, 1316-18, 117 L. Ed. 2d 532, 543 (1992)), certif. denied, 144 N.J. 377 (1996).

The prohibited RICO activity relevant here is participation in an "enterprise" which engages in "a pattern of racketeering activity." N.J.S.A. 2C:41-2(c). The Legislature did not intend "to punish mere repeated offenses," so the term "pattern" also requires "relatedness," which means "some temporal connection or continuity over time," but nonetheless encompasses "short-term criminal activity" of the proscribed kind as well as "long-term criminal activity." Ball, supra, 141 N.J. at 167-69. "Enterprise" is broadly defined to include all kinds of entities, as well as "any individual" and any "group of individuals" who are "associated in fact although not a legal entity." N.J.S.A. 2C:41-1(c). The enterprise may be "licit" or "illicit." Ibid.

The enterprise is a statutory element "distinct from the incidents constituting the pattern of activity." Ball, supra, 141 N.J. at 162. Because it is distinct, the enterprise must have an "organization" but the organization need not have "a structure with a particular configuration." Ibid.; accord Cagno, supra, 211 N.J. at 494. "[A]n informal organization functioning

as a continuing unit" is sufficient to facilitate "those kinds of interactions that become necessary when a group, to accomplish its goal, divides among its members the tasks that are necessary to achieve a common purpose." Ball, supra, 141 N.J. at 161-62.

Although evidence establishing the enterprise must "focus" on "how the participants associated with each other" and on the extent and nature of the planning, id. at 162-63, it "need not be distinct or different from the proof that establishes the pattern of racketeering activity," id. at 162, and a defendant only needs to possess "some minimal knowledge" of "'the general nature of the enterprise . . . beyond his individual role.'" Id. at 176 (quoting United States v. Eufrasio, 935 F.2d 553, 577 (3d Cir. 1991)). In this regard, our Supreme Court has declined to endorse a definition of enterprise. Id. at 177. An enterprise may be as little as "the sum of the racketeering acts," with neither a "definable structure" nor any "purpose . . . greater than the predicate acts," as we held in Ball, supra, 268 N.J. Super. at 143-44.

For an enterprise's pattern of racketeering to constitute a RICO violation, it must "affect trade or commerce," N.J.S.A. 2C:41-2, which is defined as including "all economic activity involving or relating to any commodity or service," N.J.S.A.

43                                      A-0963-12T1

2C:41-1(h). That definition of "trade or commerce" does not specify that the trade or commerce occur within this State, N.J.S.A. 2C:41-1(h), but the Legislature declared the enactment's purpose to be the protection of "the legitimate trade or commerce of this State" and "the general health, welfare and prosperity of the State and its inhabitants" from "the infiltration" of the prohibited kinds of activity. N.J.S.A. 2C:41-1.1(c).

We have held that those declarations, along with the Legislature's finding of harm to "this State's economy" from racketeering, N.J.S.A. 2C:41-1.1(b), require that a plaintiff show the prohibited conduct has affected the trade or commerce of this State." State v. Casilla, 362 N.J. Super. 554, 563-64 (App. Div.) (quoting N.J.S.A. 2C:41-1.1(c); emphasis omitted), certif. denied, 178 N.J. 251 (2003). We have also observed that the Legislature would have had no reason to address the effects of racketeering in other states, many of which have their own RICO statutes, or in interstate commerce, as to which federal legislation applies. Id. at 564-65.

In a criminal prosecution, in addition to subject matter and personal jurisdiction, a New Jersey court must have "territoriality," meaning territorial jurisdiction pursuant to N.J.S.A. 2C:1-3. State v. Denofa, 187 N.J. 24, 36 (2006). That

A-0963-12T1

statute recognizes various ways in which an offense may have "a direct nexus to New Jersey" that would justify its prosecution as a criminal offense here. State v. Sumulikoski, 221 N.J. 93, 102 (2015).

The plainest examples of territoriality are when the "result" of the offense "occurs within this State," or when the "conduct which is an element of the offense" occurs here. N.J.S.A. 2C:1-3(a)(1). Conduct committed outside the State has a nexus to New Jersey if New Jersey law would view such acts as "constitut[ing] an attempt to commit a crime within the State," N.J.S.A. 2C:1-3(a)(2), meaning an attempt to cause a result within the State that would be an offense if caused by in-state conduct. See State v. Bragg, 295 N.J. Super. 459, 464-65 (App. Div. 1996). Outside conduct is also sufficient if New Jersey law would deem it "a conspiracy to commit an offense within the State," as long as there is also an "overt act in furtherance of" the conspiracy that is committed here. N.J.S.A. 2C:1-3(a)(3). Conversely, our courts have jurisdiction over conduct occurring within the State that causes a result in another state, or is part of an attempt or conspiracy to do so, as long as that conduct would be an offense under both New Jersey law and the other state's law. N.J.S.A. 2C:1-3(a)(4).

A-0963-12T1

## (d) New York's Racketeering Laws

Turning to New York's Organized Crime Control Act (OCCA), 1986 N.Y. Laws, c. 516, § 2; N.Y. Penal Law §§ 460.00 to 460.80 (Consol. 2014), we first observe that a violation is called the crime of "enterprise corruption," N.Y. Penal Law § 460.20. Unlike New Jersey's law, OCCA is not modeled on federal statutes. It "is far more restrictive than" federal RICO, because New York "calculatedly narrowed the definition of the requisite pattern of criminal activity" to avoid conflating an ordinary "criminal offense or criminal transaction" with the ongoing "pattern" that characterizes organized crime. Simpson Elec. Corp. v. Leucadia, Inc., 515 N.Y.S.2d 794, 799 (App. Div. 1987), aff'd, 530 N.E.2d 860 (N.Y. 1988); N.Y. Penal Law § 460.10.

OCCA allows designated county and state officials to prosecute charges of enterprise corruption. N.Y. Penal Law § 460.50. Although the New York Legislature's findings declare OCCA's purposes to include "making both criminal and civil remedies available," N.Y. Penal Law § 460.00, the only penalties it provides, beyond incarceration, are criminal forfeiture and fines allocated primarily to victim restitution. N.Y. Penal Law § 460.30. Those penalties may only be imposed on persons convicted of enterprise corruption. Ibid.

Unlike our Legislature's approach, the New York Legislature rejected a policy of either liberal or strict construction in order to preserve a role for "discretion." N.Y. Penal Law § 460.00. Even when "the letter of the law" defining an OCCA violation is satisfied, "the question whether to prosecute" under OCCA "is essentially one of fairness." Ibid. Such "fairness" was preserved by leaving the decision to label alleged criminal conduct as "enterprise corruption" to "those institutions of government which have traditionally exercised that function: the grand jury, the public prosecutor, and an independent judiciary." Ibid. OCCA accordingly does not provide for a private civil cause of action, see, e.g., Simpson, supra, 515 N.Y.S.2d at 807 (Spatt, J., dissenting), as the parties concede.

OCCA liability requires the personal commission of "a pattern of criminal activity" comprising two felonies: a conspiracy to engage in a "criminal enterprise" and a knowing participation in the activity or finances of the criminal enterprise, or of any other enterprise. N.Y. Penal Law § 460.20. OCCA also specifies that the pattern of criminal activity may not serve as the "criminal enterprise." N.Y. Penal Law § 460.10(1). Instead, the criminal enterprise must consist of "a group of persons sharing a common purpose of engaging in

criminal conduct, associated in an ascertainable structure distinct from a pattern of criminal activity, and with a continuity of existence, structure and criminal purpose beyond the scope of individual criminal incidents." Ibid. In Ball, supra, 141 N.J. at 159, our Supreme Court observed that OCCA was unique among the federal and other state RICO enactments because it explicitly required an ascertainable structure, separate from the underlying crimes that constituted the pattern of racketeering activity.

Unlike New Jersey law, OCCA does not specify that a violation must affect trade or commerce, or indeed, that any particular effect must have occurred or be deemed to have occurred within New York's borders.

Consequently, in light of the vastly different approaches engaged by New Jersey and New York to combat racketeering, there is no doubt that a true conflict exists for choice-of-law purposes.

### (e) The Choice

In examining the trial court's choice, we start with our Supreme Court's observation that, "[a]lthough we have traditionally denominated our conflicts approach as a flexible 'governmental interest' analysis, we have continuously resorted to the [Second Restatement] in resolving conflict disputes

48

arising out of tort." P.V., supra, 197 N.J. at 135-36. The Second Restatement's approach focuses on the state with "the 'most significant relationship'" to the parties and issues. Id. at 136.

"Probably the most important function of choice-of-law rules" is to foster comity by promoting "harmonious relations" and facilitating "commercial intercourse" between and among states. Restatement (Second), supra, § 6 cmt. d. The first step is to establish that "an actual conflict exists" between the laws of the involved states. P.V., supra, 197 N.J. at 143. A conflict arises, like here, when one state provides a cause of action but the other does not, especially when that provision or denial reflects an intent to regulate conduct rather than allocate losses. Id. at 143-44, 148-51 (observing that a conflict existed between New Jersey law, which maintained statutory immunity from tort liability for charitable corporations, and Pennsylvania law, which "definitively abrogated its charitable immunity laws").

A conflict, however, does not always lead to a choice-of-law analysis. The analysis is preempted when our Legislature has determined that New Jersey public policy requires the application of our substantive law whenever our courts have jurisdiction over the kind of claim at issue, regardless of the

interest of another state. See id. at 140 (citing Restatement (Second), supra, § 6(1)).

### (i) Legislative Directive

Because a choice-of-law analysis may be precluded or preempted by law, our first task, in light of the arguments posed, requires that we ascertain whether there is a legislative direction regarding the application of substantive law. For the reasons that follow, we conclude that our Legislature has not made such a declaration for cases like this, either (a) expressly, or (b) by implication.

### a. Is There an Express Directive?

Plaintiffs are mistaken in arguing that our Legislature has expressly required the application of our RICO laws to out-of-state conduct. In this respect, plaintiffs rely on provisions in our Criminal Code that express its territorial parameters. The Code recognizes its application to conduct occurring "outside the State" so long as it "constitute[s] an attempt to commit a crime within the State," N.J.S.A. 2C:1-3(a)(2), or to "conduct occurring outside the State" so long as it "is sufficient under the law of this State to constitute a conspiracy to commit an offense within the State and an overt act in furtherance of such conspiracy occurs within the State," N.J.S.A. 2C:1-3(a)(3).

Because the criminal racketeering laws are also included within the Criminal Code, plaintiffs argue that the territorial reach applicable to a criminal prosecution under those racketeering laws also applies to a private RICO action brought under those same laws and principles. We disagree. The territorial parameters delineated in N.J.S.A. 2C:1-3(a), by their very terms, apply to criminal prosecutions, not private civil causes of action that may be based on provisions of the Criminal Code. N.J.S.A. 2C:1-3(a) unmistakably states that its six territorial rules apply to "a person [who] may be convicted under the law of this State of an offense . . . for which he is legally accountable" (emphasis added).

Consequently, despite plaintiffs' forceful argument, this provision does not contain the "preemptive legislative expression," State Farm Mut. Auto. Ins. Co. v. Estate of Simmons, 84 N.J. 28, 39 (1980), necessary to support the imposition of our substantive law to conduct occurring outside the State. Because such an extensive reach would likely constitute "an impermissible intrusion into the affairs of other states," O'Connor v. Busch Gardens, 255 N.J. Super. 545, 549-50 (App. Div. 1992), we reject the contention that N.J.S.A. 2C:1-3(a) constitutes a legislative directive as to the reach of New Jersey substantive law in a private RICO cause of action.

## b. Is There an Implied Directive?

We also reject any contention that such a legislative directive may be found by implication here.

The preeminent expression of New Jersey public policy is the Legislature's enactments. State Farm, supra, 84 N.J. at 39. If a statute declares that a substantive rule applies in a situation that would otherwise pose a choice-of-law question, "New Jersey courts would follow that directive even when the law of other jurisdictions dictated a contrary result." Ibid. That understanding conforms with the Second Restatement's instruction that, "subject to constitutional restrictions," a court "will follow a statutory directive of its own state on choice of law." Restatement (Second), supra, § 6(1). Examples include the Uniform Commercial Code provisions that direct courts to choose the law "of a particular state" or of the state that the parties specified. Id. at § 6 cmt. a.

But, because statutes are usually not so "explicit," a court may determine whether the issue presented "falls within the intended range of application of a particular statute." Id. at § 6 cmt. b & cmt. c. The Legislature's intended "range of application" should be enforced "when these intentions can be ascertained and can constitutionally be given effect," even if

another state's substantive law "would be applicable under usual choice-of-law principles." Id. at § 6 cmt. b. Thus, if the forum's legislature "intended that the statute should be applied to the out-of-state facts involved, the court should so apply it[.]" Ibid. "On the other hand, if the legislature intended that the statute should be applied only to acts taking place within the state, the statute should not be given a wider range of application." Ibid.

The absence of such a declaration in an enactment implies the Legislature intended application only to conduct or results that occur within the State, and that it did not have an interest in facilitating or preventing developments occurring elsewhere. Van Slyke v. Worthington, 265 N.J. Super. 603, 613-14 (Law Div. 1992). The Second Restatement similarly recognizes that laws are commonly "formulated solely with the intrastate situation in mind," with no suggestion they are "intended to have extraterritorial application." Restatement (Second), supra, § 6 cmt. e. That would explain the absence in P.V., supra, 197 N.J. at 148-49, of a suggestion that the Charitable Immunity Act could be understood as containing such a declaration, notwithstanding the "importance" of that enactment's remedial

policy and the Legislature's mandate to construe the enactment liberally.[29]

The higher standards for criminal liability in New York's OCCA, when compared to those in New Jersey's RICO statutes, meant that a defendant would be exposed to liability under New Jersey's local law for conduct that would not be illegal under New York's law. The New York Legislature made its enactment narrower than federal RICO, instead of broader as did our Legislature. See Ball, supra, 268 N.J. Super. at 107. New York

---

[29] Plaintiffs emphasize two decisions from other jurisdictions in support of their position. We do not find they suggest a contrary view than that which we have reached. In Marshall v. Fenstermacher, 388 F. Supp. 2d 536, 547 (E.D. Pa. 2005), the court was required to apply "the conflicts regime of the forum state," Pennsylvania. The plaintiff had asserted common law torts under both Pennsylvania and New Jersey law but asserted RICO claims only under New Jersey and federal law, id. at 546, presumably because Pennsylvania's statute, like New York's, did not afford a private civil cause of action. See 18 Pa. Cons. Stat. § 911. The court simply stated that it would consider the New Jersey RICO claims under the New Jersey statute, with no mention of choice-of-law doctrine and without citation to New Jersey's RICO or general territoriality statutes. Marshall, supra, 388 F. Supp. 2d at 562 n.29. In the other case urged by plaintiffs, Houston v. Whittier, 216 P.3d 1272, 1278-80 (Idaho 2009), it was explained that Idaho courts were not automatically compelled to let a plaintiff assert Oregon causes of action simply because they were statutory. Instead, the court had to find the absence of a conflict with "the public policy of the forum," and allowed the maintenance of the causes of action only after finding that Oregon statutes were "virtually identical" to Idaho's. Id. at 1279-80. Thus, plaintiffs are mistaken in suggesting that Houston presents an instance in which the existence of a statutory cause of action precluded a court from conducting a choice-of-law analysis.

A-0963-12T1

also precluded private litigants from pursuing cases that prosecutors with limited resources might decline, as opposed to New Jersey's decision to encourage private litigants with the prospect of treble damages and counsel fee awards. Cf. Lindsey v. Allstate Ins. Co., 34 F. Supp. 2d 636, 646 (W.D. Tenn. 1999) (observing that Congress included a private cause of action in federal RICO "[t]o facilitate the enforcement of its provisions"); Metro Int'l, Inc. v. Alco Standard Corp., 657 F. Supp. 627, 634 (M.D. Pa. 1986) (recognizing that, "[t]o facilitate and strengthen enforcement," Congress created RICO with a private right of action for treble damages).

As in P.V., supra, 197 N.J. at 148-49, the difference in approaches reflected a difference in policy and not a reflection of mere variations in the procedural rules to be followed in establishing a liability that both states recognized in principle for the alleged conduct, as was the case in both State Farm, supra, 84 N.J. at 42-43, and Cornett, supra, 211 N.J. at 377-78. We, thus, recognize that it is immaterial whether the New York Legislature's motivation was to protect individuals or the preeminence of its financial marketplace by limiting the vehicles that private litigants could use to inhibit incidental activity. It only matters that New York and New Jersey reached "conflicting resolutions of a particular policy issue." See

Boyes v. Greenwich Boat Works, Inc., 27 F. Supp. 2d 543, 548 (D.N.J. 1998). In other words, New York did not intend, by enacting OCCA, to regulate all the conduct New Jersey intended to reach in enacting its RICO laws; consequently, we reject plaintiffs' characterization of the New Jersey private right of action as simply a stronger remedy to advance an out-of-state policy that is otherwise the same as the in-state policy.

### (ii) Application of The Second Restatement

Having found no legislative directive that would govern the choice-of-law problem, we turn to the Second Restatement and examine its: (a) section 6 factors; (b) section 145 principles; and (c) specific tort principles.

### a. Section 6

In the absence of an explicit statutory directive or a directive that can "be ascertained by a process of interpretation and construction," Restatement (Second), supra, § 6 cmt. b, there is a nonexclusive list of seven factors to be considered in choosing the applicable law:

> (a) the needs of the interstate and inter-national systems,
>
> (b) the relevant policies of the forum,
>
> (c) the relevant policies of other interested states and the relative interests

of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

[Id. at § 6(2).]

The factor that deserves the greatest emphasis in a particular case is that which furthers the most relevant policy interest, such as "protecting the justified expectations of the parties" or "favoring uniformity of result." Id. at § 6 cmt. c. "Generally speaking, it would be unfair and improper to hold a person liable under a local law of one state when he had justifiably molded his conduct to conform to the requirements of another state," as opposed to acting "without giving thought to the legal consequences of [his] conduct or to the law that may be applied." Id. at § 6 cmt. g. When "the purposes sought to be achieved by a local statute or common law rule would be furthered by its application to out-of-state facts, however, this is a weighty reason why such application should be made." Id. at § 6 cmt. e.

The proper choice often "represents an accommodation of conflicting values" that requires the forum court to name the "general principle" that deserves the most weight and then analyze the circumstances of the case in that regard. Id. at § 6 cmt. c. Without a statutory mandate to apply its own local law, a court "must decide for itself whether the purposes sought to [be] achieved by a local statute or rule should be furthered at the expense of" other relevant factors. Id. at § 6 cmt. e. Those include "the relevant policies of all other interested states" and their "relative interest" in regulating the underlying conduct that gave rise to the litigation, or in providing a remedy for a particular plaintiff against a particular defendant. Id. at § 6 cmt. f. "[W]here the policies of the interested states are largely the same but where there are nevertheless minor differences between their relevant local law rules," there is "good reason for the court to apply the local law of that state which will best achieve the basic policy, or policies, underlying the particular field of law involved." Id. at § 6 cmt. h.

In applying section 6 of the Second Restatement in P.V., supra, 197 N.J. at 152-53, the Court noted that interstate comity additionally counsels that the forum state should defer to the other state's local law if: (1) applying the forum

state's local law would "substantially impair" the other state's ability "to regulate the conduct of those who chose to operate within its borders," and (2) applying the other state's local law would not inhibit the forum's ability to regulate conduct that occurs within its own borders. For example, the plaintiff in P.V. was a New Jersey resident pursuing a tort claim against a Pennsylvania charity for conduct that occurred in Pennsylvania. Id. at 135. The Court found both of the conditions that it noted for affording comity: (1) applying New Jersey's broad charitable immunity to the activity in Pennsylvania would "substantially impair[]" Pennsylvania's "ability to regulate the conduct of those who chose to operate within its borders," and (2) applying Pennsylvania law would not prevent New Jersey from applying its law of charitable immunity to activities within New Jersey. Id. at 153.

The parallel of this case to P.V. rests on the fact that the alleged RICO activity predominantly occurred in New York rather than New Jersey, and was primarily aimed at harming plaintiffs indirectly by damaging their reputation by influencing the mostly New York-based financial markets and financial news media. In those circumstances, the application of New York law would not set a precedent that inhibits New Jersey from providing a civil cause of action for in-state activities

that qualify as racketeering under New Jersey's statute; New Jersey could still protect its domiciliaries and New Jersey commerce from harm that is felt mostly within its borders.

In contrast, applying New Jersey's civil cause of action would nullify New York's policy of protecting analogous activity from being prosecuted as "racketeering" by private litigants, who lack the institutional constraints of prosecutors and grand juries. These distinctions in the two neighboring state's laws created differing expectations about what conduct each would allow or prohibit.

This case is, thus, distinguishable from those in which courts declined to dismiss claims recognized under New Jersey local law, even though out-of-state plaintiffs might have been unable to pursue such causes of action under their own state's local law. In those matters, the plaintiffs were allowed to pursue their claims on the ground that their home states had no reason to deny them the fortuity of a remedy for what both states recognized as "the same evil," even if they did not recognize it to the same degree. See Boyes, supra, 27 F. Supp. 2d at 547-48 (recognizing that Pennsylvania had no interest in denying its residents the greater damages available under New Jersey consumer fraud statutes for claims against a New Jersey seller); Smith v. Alza Corp., 400 N.J. Super. 529, 542-51 (App.

Div. 2008) (recognizing that Alabama had no interest in denying its residents the procedural and substantive advantages afforded under New Jersey's product liability and consumer fraud statutes, but not Alabama's, for claims against a New Jersey manufacturer); Almog v. Isr. Travel Advisory Serv., Inc., 298 N.J. Super. 145, 159 (App. Div. 1997) (recognizing Israel had no interest in denying its citizens the substantive advantages of New Jersey defamation law in New Jersey residents' claims for defamation published in New Jersey), appeal dismissed, 152 N.J. 361, cert. denied, 525 U.S. 817, 119 S. Ct. 55, 142 L. Ed. 2d 42 (1998).

That, however, is not what's before us. As we have observed, New Jersey and New York local law do not just differ in the degree to which they deal with an otherwise common policy of allowing a private civil RICO cause of action. They share no such interest, as demonstrated by the fact that New Jersey law permits, and New York law categorically disallows, such private claims. Thus, we conclude that the section 6 factors favor choosing New York as the state providing the applicable law.

### b. Section 145

In addition, when a cause of action sounds in tort, the general choice-of-law rule is to ascertain the state with "the most significant relationship to the occurrence and the parties

under the principles stated in [section] 6." <u>Restatement</u> <u>(Second)</u>, <u>supra</u>, § 145(1). That determination is to be made for each "issue in tort," <u>ibid.</u>, meaning each element needed to establish the tort or a defense to it. <u>Id.</u> at § 145 cmt. d. In making that determination, certain contacts are "to be taken into account," including:

> (a) the place where the injury occurred,
>
> (b) the place where the conduct causing the injury occurred,
>
> (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and
>
> (d) the place where the relationship, if any, between the parties is centered.
>
> [<u>Id.</u> at § 145(2).]

<u>Accord</u> <u>P.V.</u>, <u>supra</u>, 197 <u>N.J.</u> at 141. Plaintiffs and defendants have not asserted or alleged a prior relationship that preceded the alleged events in this dispute.

The contacts analysis is "not merely quantitative." <u>Id.</u> at 147. Its purpose is to assess the contacts in terms of the guiding touchstones of the Second Restatement's section 6, which, "[r]educed to their essence," are: "(1) the interests of interstate comity; (2) the interests of the parties; (3) the interests underlying the field of tort law; (4) the interests of judicial administration; and (5) the competing interests of the

states." Ibid. (citations omitted).  The "relative importance" of the matter's contacts with a state may vary according to "the nature of the tort involved." Restatement (Second), supra, § 145 cmt. f. Furthermore, for each tort issue, the contacts "are to be evaluated according to their relative importance with respect to the particular issue." Id. at § 145 & cmt. d.

If the primary purpose of the local "tort rule" is to deter or punish misconduct, then the most important contact will be the conduct's location. Id. at § 145 cmt. c. "[T]he same is true when the conduct was required or privileged by the local law of the state where it took place," id. at § 145 cmt. e, so "[a] rule [of tort] which exempts the actor from liability for harmful conduct is entitled to the same consideration in the choice-of-law process as is a rule which imposes liability," id. at § 145 cmt. c. In that way, the tort policies behind New Jersey's local law and New York's local law on private civil causes of action for racketeering are entitled to equal consideration, even if the purpose of New York's "tort rule" was to prevent private civil liability for certain conduct that would create such liability in New Jersey. In short, were we to apply section 145's general rule for torts, we would choose New York as providing the applicable law because it has the most significant relationship under section 6.

## c. Specific Tort Principles

In addition to section 145's general factors for torts, the Second Restatement also provides more specific choice-of-law rules for particular torts. P.V., supra, 197 N.J. at 141. There are rules for personal injuries, injuries to tangible things, injuries resulting from a plaintiff's reliance on fraud or misrepresentations, and injuries resulting from defamation or injurious falsehood. Restatement (Second), supra, §§ 146-51. Only injurious falsehood is germane to plaintiffs' RICO claim.

For Second Restatement purposes, an "injurious falsehood" is any false statement that causes pecuniary loss. Id. at § 151 cmt. a; see also Restatement (Second) of Torts § 623A (1976) (declaring that an injurious falsehood creates liability for one who publishes it with knowledge or reckless disregard of its falsity and with intent "to result in harm to interests of the other having a pecuniary value"). An injurious falsehood "need not cast any reflection upon the plaintiff's personal reputation in order to be actionable." Restatement (Second), supra, § 151 cmt. a. It is enough that the false statement "disparage[s] the plaintiff's title to his property, or its quality or the character or conduct of the plaintiff's business." Ibid. This description encompasses defendants' alleged RICO scheme.

The Second Restatement does not have another tort rule that might cover plaintiffs' RICO claims. Plaintiffs' alleged RICO injuries are not a form of defamation, nor do they constitute a form of "personal injury" for choice-of-law purposes, because "personal injury" is limited to "physical harm or mental disturbance," which means that "injuries to a person's reputation . . . are not 'personal injuries' in the sense here used." Id. at § 146 cmt. b. Plaintiffs' RICO injuries are not "Injuries to Tangible Things" as used in section 147 of the Second Restatement. Plaintiffs' alleged injuries do not arise from "Fraud and Misrepresentation" for choice-of-law purposes because plaintiffs do not allege that they "suffered pecuniary harm on account of [their own] reliance on the defendant[s'] false representations." Id. at § 148(1). Rather, plaintiffs allege reliance by others. Plaintiffs do not assert a defamation claim, but the rules for "Defamation" and "Multistate Defamation" in sections 149 and 150 of the Second Restatement are incorporated into section 151, which covers "Injurious Falsehood." Thus, the only rules for specific torts relevant to plaintiffs' RICO claim are sections 149 through 151 of the Second Restatement.

A-0963-12T1

For defamation,[30] "the local law of the state where the publication occurs determines the rights and liabilities of the parties, except as stated in [section] 150, unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in [section] 6 to the occurrence and the parties." Id. at § 149. That same rule governs the choice of law analysis for injurious falsehood. Id. at § 151 & cmt. b. Here, the state where the publications primarily occurred was the state with the most significant relationship — New York.

Next, we must consider whether section 150 calls for a different result. For multistate defamation, an "aggregate communication" is "any one edition of a book or newspaper, or any one broadcast over radio or television, exhibition of a motion picture," or a similar act of publication, id. at § 150(1), meaning "a single aggregate communication to a large number of persons at one time." Id. at § 150 cmt. c. Multiple publications of a defamatory statement to numerous individuals

_____

[30] To be clear, plaintiffs did not assert a defamation claim nor complained in this appeal that their allegations should have been interpreted as if they had sought damages based on a claim of defamation. Nevertheless, their disparagement claims may — for these purposes — be viewed similarly due to their theoretical kinship. Cf. Dairy Stores, Inc. v. Sentinel Pub. Co., 104 N.J. 125, 133 (1986) (recognizing that the torts of product disparagement and defamation "sometimes overlap").

are not necessarily "aggregate communications" subject to section 150, as they can be separate acts that require an individual choice-of-law analysis that may lead to differing results. Id. at § 149 cmt. a. Although plaintiffs have alleged multiple publications of certain defamatory statements, which might not qualify as section 150 multistate defamations, they primarily allege aggregate communications published in a manner intended to influence all persons and entities who follow or participate in the financial marketplace and financial news media.

The "single publication rule" applies to section 150 aggregate communications, so the matter may be determined as if plaintiff has only one cause of action, regardless of the number of jurisdictions in which the aggregate communication was published. Id. at § 150 cmt. c; Restatement (Second) of Torts, supra, § 577A cmts. e & f.

In addition, we must consider that, in this context, a corporation is a legal person and therefore without domicile in the choice-of-law sense. Restatement (Second), supra, § 150 cmt. f; see also id. at § 11 cmt. 1. Thus, when a corporation claims multistate defamation, the state with the most significant relationship to the matter "will usually be the state where the corporation . . . had its principal place of

67                                                          A-0963-12T1

business" as long as that state was one in which the multistate defamation was published. Id. at § 150(3). This is because it is assumed that a corporation sustains its greatest injury from defamation there. Id. at § 150 cmt. f. Another state, however, may have the "most significant relationship with respect to the particular issue if it is the state where the defamatory communication caused plaintiff the greatest injury to its reputation." Ibid. That can occur if "the matter claimed to be defamatory related to an activity of the plaintiff that is principally located in this state," id. at § 150 cmt. f(b), or "the plaintiff suffered greater special damages in this state than in the state of its principal place of business," id. at § 150 cmt. f(c), or "the place of principal circulation of the matter claimed to be defamatory was in this state," id. at § 150 cmt. f(d).

As alleged by plaintiffs, defendants' RICO scheme targeted plaintiffs' use of the New York financial markets for securities offerings and for third-party trading of their securities, which was an "activity" of plaintiffs that was "principally located in" New York. Ibid. As a result, New York was the state where defendants' false communications caused plaintiffs "the greatest injury to [their] reputation" because the main injury from the alleged RICO scheme was the decrease in offering and market

share prices due to the reputational harm that plaintiffs suffered in the markets where plaintiffs conducted such "activity." That is bolstered because, although defendants' publications were multistate, "the place of principal circulation of the matter claimed to be defamatory was in" New York. Ibid. Thus, New York is the state with the most significant relationship under section 150 as well as sections 6 and 145.

That conclusion remains undisturbed when considering "special damages." If the injury was the loss of particular customers or of market share in particular locations, those would also be important contacts in determining which state's law to apply. See Pony Comput., Inc. v. Equus Comput. Sys. of Miss., Inc., 162 F.3d 991, 996 (8th Cir. 1998); Jelec USA, Inc. v. Safety Controls, Inc., 498 F. Supp. 2d 945, 952-53 (S.D. Tex. 2007). As we discuss elsewhere, plaintiffs' cognizable special damages are the alleged loss of 180 customers throughout the country. There was no evidence that any loss of customers or market share occurred to a greater degree in New Jersey than in New York or elsewhere.

We also are presented with no ground upon which to conclude that defamation or disparagement of a parent company generally amounts to defamation or disparagement of a subsidiary, or vice

69

versa. The issue of entity separation for corporate parents and subsidiaries raises additional questions concerning the locus of the injury. For example, in a case that concerned the looting of a corporation rather than its defamation, we favored application of Delaware's equitable principles to pierce the corporate veil, and gave the parent standing to protect financial interests against the adverse party, because the parent's interests were not as distinct from its subsidiary's contractual rights as the doctrine of "entity separateness" generally presumes. Bondi, supra, 423 N.J. Super. at 437-39. Although such recognition implies that the subsidiary's injury is also an injury to the parent, we intended no implication that the locus of the injury necessarily moved from where the subsidiary as a separate entity would have felt it to where the parent as a separate entity would feel it.

Plaintiffs have alleged and argued that C&F's finances were inextricably intertwined with Fairfax's. And they have argued that the market viewed Fairfax and its subsidiaries as so inseparable that some defendants bought shares of the subsidiaries and affiliates as proxies for Fairfax shares, which had become too costly to borrow due to demand from those shorting Fairfax. Plaintiffs have further argued that defendants' defamation of C&F served the main goal of destroying

the entirety of Fairfax itself, and defendants rarely bothered to distinguish among its subsidiaries. According to plaintiffs, the RICO enterprise operated by spreading false information in the financial markets and the financial news media, and by encouraging federal law enforcement and securities officials outside New Jersey to investigate Fairfax's use of reinsurance. The goal was to damage Fairfax's reputation in order to reduce the market share price, and the proceeds of securities offerings, of all Fairfax entities.

In responding, defendants mostly view Fairfax as an integrated company whose general financial instability reached every branch of the Fairfax family tree.[31] And defendants' criticisms of C&F served more as criticism of the Fairfax edifice than criticisms of C&F individually. Indeed, some defendants expressly articulated an intent for their criticisms of a subsidiary, or their short positions in a subsidiary, to harm plaintiff Fairfax Financial Holdings. In addition, we observe that the parent corporation of the financially-intertwined Fairfax entities was located in Toronto, and all share-trading occurred on the New York Stock Exchange or the Toronto Stock Exchange.

---

[31] We have appended to this opinion a graph setting forth the relationship of the various Fairfax entities.

A-0963-12T1

In summary, the weight of the conduct in this alleged enterprise of multistate disparagement was in New York, not New Jersey. The financial markets and financial news media were predominantly located in New York, making New York central to defendants' publications. New York is "the state where the [harmful] communication[s] caused the greatest injury to [plaintiffs'] reputation." Restatement (Second), supra, § 150 cmt. f. For all these reasons, New York has "a more significant relationship to the occurrences and the parties." Ibid.

### (iii) Conclusion

For these reasons, we conclude that the trial judge correctly gave C&F's direct alleged losses little weight in balancing the state contacts and interests for the RICO claims. We, thus, affirm the determination that New York law applied and that, in applying New York law, plaintiffs' racketeering claim could not stand.

## THE MAINTAINABILITY OF
## THE COMMON LAW CLAIMS

Plaintiffs contend the trial judge erroneously dismissed two of their common law claims.[32] They first argue the trial judge mistakenly applied New York's statute of limitations rather than New Jersey's more generous time-bar to their disparagement claim,[33] and, second, they argue the judge erroneously excluded evidence of damages on their claims of disparagement and tortious interference with prospective economic advantage.

### (1) Statute of Limitations
### Applicable to Plaintiffs'
### Disparagement Claim

Plaintiffs argue the trial judge erred in ascertaining the appropriate statute of limitations to be applied to their disparagement claim. They argued in the trial court that New

---

[32] Plaintiffs do not address in their appeal the trial court's disposition of their tortious interference with contractual relations claim.

[33] Morgan Keegan has not only responded to plaintiffs' arguments about the applicable time-bar, but has also cross-appealed and argues, among other things, that the trial judge erred in applying New York's three-year statute of limitations instead of New York's one-year limitation period.

A-0963-12T1

Jersey's six-year statute of limitations[34] applied, Morgan Keegan argued for application of New York's one-year statute of limitations,[35] and the trial judge found controlling the three-year New York statute of limitations.[36]

After this appeal was argued the Supreme Court decided McCarrell v. Hoffmann-LaRoche, Inc., supra, 227 N.J. at 574-75,[37] which illuminates our way by holding that section 142 of the Second Restatement "is now the operative choice-of-law rule for resolving statute-of-limitations conflicts because it . . . channel[s] judicial discretion and lead[s] to more predictable and uniform results that are consistent with the just expectations of the parties." The Court described its holding as "a natural progression in [its] conversion from the governmental-interest test to the Second Restatement [which

---

[34] N.J.S.A. 2A:14-1 (declaring that "[e]very action at law for . . . any tortious injury to real or personal property . . . shall be commenced within 6 years next after the cause of any such action shall have accrued").

[35] N.Y. C.P.L.R. § 215(3) (declaring that "an action to recover damages for," among other things, "libel, slander, [and] false words causing special damages" "shall be commenced within one year").

[36] N.Y. C.P.L.R. § 214(4) (declaring that "an action to recover damages for an injury to property" "must be commenced within three years").

[37] We invited and recently received and considered the parties' supplemental briefs on McCarrell's impact on the issues in this case.

began] in P.V.[, supra,] 197 N.J. 132," and which adopted the methodology described earlier in this opinion for resolving conflicts concerning substantive tort law. McCarrell, supra, 227 N.J. at 574-75. McCarrell's approach has certainly simplified the disposition of most conflicts concerning a choice between two or more states' statutes of limitations.

The process starts with an understanding that when an action is commenced here, "New Jersey's choice-of-law rules [apply] in deciding whether this State's or another state's statute of limitations governs the matter." Id. at 583. In defining New Jersey choice-of-law rules, the McCarrell Court instructed that the first matter of interest is whether there is a "true conflict." Id. at 584. "When application of the forum state's or another state's statute of limitations results in the same outcome, no conflict exists, and the law of the forum state governs." Ibid. (citing Rowe v. Hoffmann-La Roche, Inc., 189 N.J. 615, 621 (2007)). A true conflict occurs "when a complaint is timely filed within one state's statute of limitations but is filed outside another state's." Ibid. (citing Schmelze v. ALZA Corp., 561 F. Supp. 2d 1046, 1048 (D. Minn. 2008)).

We can perceive a circumstance — perhaps applicable here — where a complaint is filed within time regardless of which competing state's statute of limitations is applied, but the

scope of the claim is limited or enhanced depending on the statute of limitations applied. For example, a plaintiff may sue on a series of defamatory statements occurring over the course of two years. If one state has a one-year statute of limitations and the other has a two-year statute of limitations, the plaintiff's suit — if filed within one year of the last defamatory statement — would be timely filed pursuant to either state's statute of limitations. But, if the one-year statute of limitations is found applicable, the allegations or resulting damages would be limited by that choice of law because allegations of defamatory statements made more than a year before the suit's commencement would not be cognizable. That particular problem was not likely contemplated in <u>McCarrell</u> because the facts didn't warrant its consideration; that product liability action was either timely if our statute of limitations applied or entirely barred if Alabama's applied.

In any event, other than referring to a "true conflict" as one which makes a difference as to <u>the timeliness</u> of the suit, the Court also emphasized that the test is whether the choice of "statute of limitations is <u>outcome determinative</u>." <u>Id.</u> at 584 (emphasis added). In the example we have provided, the outcome would be impacted if a suit would be timely under either statute of limitations because, if the shorter limitations period was

A-0963-12T1

applied, only the defamatory statements asserted within one year of the filing would be actionable. In ascertaining the existence of a true conflict, we assume the McCarrell Court intended the broader view suggested by its "outcome determinative" language. Indeed, later in the opinion, the Court again emphasized that whether the conflict is "outcome determinative" is the question, and, in that regard, the Court quoted with approval a federal judge who stated, in a different way, that there is no conflict if "'there is no divergence between the potentially applicable laws.'" Id. at 591 n.9 (quoting Spence-Parker v. Del. River & Bay Auth., 656 F. Supp. 2d 488, 497 (D.N.J. 2009)). Because some or most of defendants' allegedly disparaging statements from 2002 to 2006 would cease to be actionable if a shorter New York statute — either New York's one-year or its three-year statute of limitations — were to be applied to this 2006 complaint rather than New Jersey's six-year statute of limitations, N.J.S.A. 2A:14-1, we conclude that the choice-of-law decision here is "outcome determinative" and requires a resolution.

There being a true conflict, McCarrell instructs, 227 N.J. at 592-93, that we must apply the Second Restatement's section 142, which states that, "barring exceptional circumstances [that] make such a result unreasonable":

> (1) The forum will apply its own statute of limitations barring the claim.

(2) The forum will apply its own statute of limitations permitting the claim unless:

(a) maintenance of the claim would serve no substantial interest of the forum; and

(b) the claim would be barred under the statute of limitations of a state having a more significant relationship to the parties and the occurrence.

Because application of N.J.S.A. 2A:14-1 permits the maintenance of the claim, subsection (1) of section 142 has no application. We, thus, gaze toward section 142's subsection (2). And, as the Court held, under section 142(2)(a), "the statute of limitations of the forum state generally applies whenever that state has a substantial interest in the maintenance of the claim." McCarrell, supra, 227 N.J. at 593. If that is so, then "the inquiry ends." Ibid. It is "[o]nly when the forum state has 'no substantial interest' in the maintenance of the claim [that] a court [would] consider [s]ection 142(2)(b) — whether 'the claim would be barred under the statute of limitations of a state having a more significant relationship to the parties and the occurrence.'" Ibid.

In this case, section 142 is easily applied, as anticipated by McCarrell's description of the test. Ibid. (observing that section 142: "benefits from an ease of application; places both

this State's and out-of-state's citizens on an equal playing field, thus promoting principles of comity; advances predictability and uniformity in decision-making; and allows for greater certainty in the expectations of the parties"). Section 142 "makes clear that when New Jersey has a substantial interest in the litigation and is the forum state, it will generally apply its statute of limitations." Ibid. Stated another way, under section 142, the forum state "presumptively applies its own statute of limitations unless . . . [it] has no significant interest in the maintenance of the claim and the other state, whose statute has expired, has 'a more significant relationship to the parties and the occurrence,' . . . or . . . given 'the exceptional circumstances of the case,' following the Second Restatement rule would lead to an unreasonable result." McCarrell, supra, 227 N.J. at 597.

There is no doubt that New Jersey has a substantial interest in this litigation. One of the plaintiffs — C&F — has its principal place of business in New Jersey and claims injuries to its business caused by the alleged disparagement of it and its products. Because New Jersey has a significant interest, it is irrelevant under section 142 that New York has a "more significant relationship to the parties and the occurrence." Ibid. Absent "exceptional circumstances," not

remotely suggested here, that this would "lead to an unreasonable result," the test described in <u>McCarrell</u> requires application of our own statute of limitations. <u>Ibid.</u>

Consequently, the timeliness of plaintiffs' disparagement cause of action — the only claim as to which plaintiffs argue the judge erred in applying a shorter, New York statute of limitations — is governed by our six-year statute of limitations. <u>N.J.S.A.</u> 2A:14-1.[38] <u>See</u> <u>Patel v. Soriano</u>, 369 <u>N.J. Super.</u> 192, 247 (App. Div.), <u>certif. denied</u>, 182 <u>N.J.</u> 141 (2004). Although New Jersey has a one-year statute of limitations for libel and slander of a person, <u>N.J.S.A.</u> 2A:14-3, plaintiffs claim commercial disparagement of their business and products, sometimes referred to as trade libel. <u>Patel</u>, <u>supra</u>, 369 <u>N.J. Super.</u> at 246-47. In New Jersey, "a claim for trade libel is subject to the general six-year statute of limitations applicable to malicious interference claims." <u>Id.</u> at 247. Moreover, that statute of limitations applies to disparagement whether "the aspersion reflects only on the quality of plaintiff's products, or on the character of plaintiff's

_____

[38] For these same reasons, we reject the argument Morgan Keegan asserted in its cross-appeal that the trial judge erred in applying New York's three-year statute of limitations, instead of New York's one-year statute of limitations.

business as such." Ibid.[39] Therefore, "the more restricted statute of limitations for slander does not apply" here. Id. at 249.

The six-year statute of limitations applies to plaintiffs' disparagement claims, as well as their other common law causes of action. The trial judge erred in applying a shorter statute of limitations.

---

[39] As the trial judge recognized, a statement that attacks an insurance company as a fraud or a Ponzi scheme, or an assertion that it is insolvent or bankrupt, among other similar things, may constitute an attack on its products. Here, statements disparaging the financial condition of plaintiffs may have a direct link to its products; plaintiffs are in the business, through the sale of insurance policies, of making promises to clients to pay them money in the future in the event of certain occurrences. Statements that question plaintiffs' ability to make those payments strike at both the heart of their reputation and the products they sell — a view that can be seen in the assertions of Fairfax's chairman and chief executive officer:

> When you're in the insurance business and you are selling a promise to pay a claim in a year or two or three or four, when you have all of this noise . . . when there [are] statements made that the company is bankrupt, of course, you have clients who would not do business with you. Why would a client do business with a property casualty insurance company that's going bankrupt?

A-0963-12T1

## 2. Dismissal of Plaintiffs'
## Disparagement and Tortious Interference
## With Prospective Economic Advantage Claims
## Based on the Absence of Special Damages

Plaintiffs also argue the trial court erred in excluding evidence of damages allegedly incurred because of both disparagement and tortious interference with prospective economic advantage. This involves not only a determination of which state's substantive law applies in assessing the maintainability of those common law actions but also the content of that substantive law.

### (a) Choice of Law

We need not discuss at length our determination that New York provides the substantive law applicable to plaintiffs' common law causes of action. Although the choice-of-law principles discussed in Section IV(B)(1), supra, required application of this State's statute of limitations, other choice-of-law principles — already discussed in Section IV(A), supra, which led to our affirmance of the dismissal of the racketeering claim — compel the adoption of New York's common law in assessing the sufficiency of plaintiffs' claims of

disparagement and tortious interference with prospective economic advantages.[40]

## (b) Common Law Requirements

The parties' chief bone of contention concerns the types of damages plaintiffs were required to assert and prove to sustain their claims of disparagement and tortious inference with prospective economic advantage. We discuss these separately.

## (i) Disparagement

We initially observe that, in New York, defamation claims, which are akin to disparagement claims, require "special damages," meaning an economic loss resulting from the harm to the plaintiff's reputation. Liberman v. Gelstein, 605 N.E.2d 344, 347 (N.Y. 1992); Matherson v. Marchello, 473 N.Y.S.2d 998, 1000 (App. Div. 1984). This requires the identification of customers who would have dealt with the plaintiff but for the reputational harm. Squire Records, Inc. v. Vanguard Recording Soc'y, Inc., 226 N.E.2d 542, 543 (N.Y. 1967); Drug Research Corp. v. Curtis Publ'g Co., 166 N.E.2d 319, 322 (N.Y. 1960); DiSanto v. Forsyth, 684 N.Y.S.2d 628, 629 (App. Div. 1999);

---

[40] We will not conduct an individualized choice-of-law assessment regarding plaintiffs' common-law claims for reasons expressed earlier. See Section IV(A)(3)(b), supra.

Waste Distillation Tech., Inc. v. Blasland & Bouck Eng'rs, P.C., 523 N.Y.S.2d 875, 877 (App. Div. 1988).

This principle seems to have emanated from New York state courts' disagreements with one federal case in New York that had allowed a substitute measure of damages for a plaintiff that sold its product only by mail order. Charles Atlas, Ltd. v. Time-Life Books, Inc., 570 F. Supp. 150, 156 (S.D.N.Y. 1983). The district judge in Charles Atlas held that it was "virtually impossible to identify those who did not order the plaintiff's product because of the" product disparagement, and allowed the plaintiff "to prove lost sales by other means" as long as "'other factors [are] satisfactorily excluded by sufficient evidence[.]'" Ibid. (quoting William L. Prosser, Handbook of the Law of Torts § 128, at 923-24 (4th ed. 1971)).[41] In rejecting

_____

[41] Dean Prosser observed:

> [T]he whole modern tendency is away from any such arbitrary rule. Starting with a few cases involving goods offered for sale at an auction, and extending to others in which there has been obvious impossibility of any identification of the lost customers, a more liberal rule has been applied, requiring the plaintiff to be particular only where it is reasonable to expect him to do so. It is probably still the law everywhere that he must either offer the names of those who have failed to purchase or explain why it is impossible for him to do so; but where he cannot, the matter is dealt with by analogy

(continued)

<u>Charles Atlas</u>, New York's Appellate Division held that a disparagement claim is dependent on "evidence of particular persons who ceased to be or refused to become customers." <u>De Marco-Stone Funeral Home Inc. v. WEBG Broadcasting Inc.</u>, 610 <u>N.Y.S.</u>2d 666, 668 (App. Div. 1994); <u>see also</u> <u>Prince v. Fox Television Stations, Inc.</u>, 941 <u>N.Y.S.</u>2d 488, 488 (App. Div. 2012).

## (ii) Tortious Interference With Prospective Economic Advantage

To sustain a claim for tortious interference with prospective economic advantage pursuant to New York substantive law: there must be a prospective business relationship between the plaintiff and a third party; the defendant must know of that relationship and intentionally interfere with it; the defendant's means of interference must amount to a crime, an independent tort, or conduct that arose solely out of malice; and the result must be some injury to the relationship with the third party. <u>Posner v. Lewis</u>, 965 <u>N.E.</u>2d 949, 952 n.2 (N.Y.

---

(continued)

> to the proof of lost profits resulting from breach of contract. If the possibility that other factors have caused the loss of the general business is satisfactorily excluded by sufficient evidence, this seems entirely justified by the necessities of the situation.

2012); Carvel Corp. v. Noonan, 818 N.E.2d 1100, 1102-03 (N.Y. 2004); Amaranth LLC v. J.P. Morgan Chase & Co., 888 N.Y.S.2d 489, 494-96 (App. Div. 2009). The requirement to specifically identify the business lost is the same as noted above with regard to disparagement claims.

The business prospect must be identifiable, and the plaintiff must show that it would have obtained that prospect's business but for the interference. Learning Annex Holdings, LLC v. Gittelman, 850 N.Y.S.2d 422, 423 (App. Div. 2008). The defendant must know of the specific third party and the prospective business relationship. See GS Plasticos Limitada v. Bureau Veritas Consumer Prods. Servs., Inc., 931 N.Y.S.2d 567, 568 (App. Div.), appeal denied, 957 N.E.2d 1159 (N.Y. 2011).

## (c) Damages Asserted

To maintain its common law claims, C&F's marketing department developed a list of 180 specifically-identified customers or potential customers whose business it claims C&F would have maintained or secured but for defendants' wrongful acts. C&F employees developed a model of the lost revenue and profits for each such customer. For the period between 2003 and 2009, they estimated the lost revenue at $102 million and lost profits at $19 million; the total volume of business "quoted but not written" by C&F during that period was approximated at $14

A-0963-12T1

billion, of which the revenue lost on those 180 accounts represented less than one percent.

Jorge Echemendia, a corporate representative of United States Fire Insurance Company, a wholly-owned subsidiary of C&F, testified at a deposition that he and another C&F employee developed the list from C&F's records, which included the customer call report system that was used to archive notes on existing and potential accounts, and from communications with brokers and other producers. C&F recognized in 2004 that customers were paying greater attention to an insurer's ratings and financial capacity, and it accordingly added those concerns to the list of reasons that could be cited in a call report as a cause for losing a particular customer. Approximately 170 of the 180 accounts in the list were identified due to the selection of such a reason in the call report, while the rest were identified from emails that attributed the loss of an account to those reasons.

The trial court found no proof the 180 customers relied on defendants' statements. But plaintiffs proffered that defendants' scheme was designed to disparage and interfere by lowering C&F's ratings and to cast doubt on the financial soundness of C&F and its parent. Plaintiffs' proofs that these 180 customers relied on the resulting reduced ratings and

A-0963-12T1

financial reputation indicated these customers relied on defendants' statements indirectly, as defendants allegedly intended. For example, plaintiffs cited a March 2005 email, which followed a March 2005 rating agency report. Echemendia also asserted that "a few" of "the articles distributed by the defendants" were named in a call report or in an email.

The question before us is not whether these assertions of lost business are persuasive or even whether they must be presented through expert opinion. The question as we understand it, in light of the trial court's disposition and in light of New York law, requires a determination of whether plaintiffs asserted a loss of business sufficient to withstand summary disposition. We find plaintiffs' allegations regarding the 180 lost customers were sufficiently specific to meet the requirements of New York law.[42]

### 3. Summary

For these reasons, our review of the trial judge's disposition of the two common law causes of action referred to in plaintiffs' appeal — disparagement and the tortious

---

[42] Because plaintiffs' disparagement and tortious interference with prospective economic advantage claims survive, their claim of a civil conspiracy may also be further maintained. Corris v. White, 289 N.Y.S.2d 371, 374 (App. Div. 1968); see also Banco Popular N. Am. v. Gandi, 184 N.J. 161, 177-78 (2005).

A-0963-12T1

interference with prospective economic advantage — leads us to conclude that: New Jersey's six-year statute of limitations applies to those claims; New York law imposes a requirement that plaintiffs allege special damages; and summary judgment was erroneously granted because the claim of 180 lost business prospects was sufficient to meet the requirements of New York law.

## C

## THE PERSONAL JURISDICTION RULINGS

Plaintiffs argue that the trial judge erred in dismissing the Kynikos and Third Point defendants for lack of personal jurisdiction. Plaintiffs assert that those defendants ought to be held subject to suit in New Jersey because they participated in the overarching conspiracy to harm them. In response, these defendants argue that our courts do not recognize conspiracy-based jurisdiction and, alternatively, that plaintiffs have not presented any competent evidence to show they were part of a conspiracy. As required by <u>Brill</u>, <u>supra</u>, 142 <u>N.J.</u> at 540, we assume plaintiffs' allegations regarding these defendants are true for purposes of determining whether the trial court properly granted summary judgment on personal jurisdiction grounds.

Before examining the relationship of these defendants to New Jersey, we first observe that the due process clause permits the assertion of personal jurisdiction over a nonresident in two ways — general and specific jurisdiction. Waste Mgmt., Inc. v. Admiral Ins. Co., 138 N.J. 106, 119 (1994), cert. denied, 513 U.S. 1183, 115 S. Ct. 1175, 130 L. Ed. 2d 1128 (1995). A nonresident's continuous and systematic contacts that approximate an actual presence give rise to general jurisdiction. Ibid. Specific or "case-linked" jurisdiction "depends on an 'affiliatio[n] between the forum and the underlying controversy,' principally, activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 919, 131 S. Ct. 2846, 2851, 180 L. Ed. 2d 796, 803 (2011) (quoting Arthur T. von Mehren & Donald T. Trautman, Jurisdiction to Adjudicate: A Suggested Analysis, 79 Harv. L. Rev. 1121, 1136 (1966)).

We, thus, turn to the relationship between these two groups of defendants — the Kynikos and Third Point defendants — and this State, and examine whether there is jurisdiction in this State over these defendants through a consideration of the concepts of (1) general, (2) specific, and (3) conspiracy-based jurisdiction.

A-0963-12T1

## 1. General Jurisdiction

### (a) Kynikos

Kynikos — formed in 1985 as a limited partnership organized in Delaware with its principal place of business in New York — is an investment advisor and management company that specializes in short-selling and has managed over $1 billion for its clients. During the relevant period, Kynikos purchased services and products from New Jersey vendors; it did not, however, have any property, an office, a mailing address, a phone number, or a bank account in this State. Kynikos was not registered to conduct business in New Jersey, and any employees who were residents of New Jersey reported to Kynikos's offices in New York or London.

Kynikos did not advertise its services in New Jersey. It operated a password-protected website, which only its existing or prospective clients could access. Kynikos had seven New Jersey clients between 2002 and 2007; those relationships were client-initiated and comprised less than one-half of one percent of Kynikos's total investment assets. Kynikos filed partnership tax returns in New Jersey only because some of its related entities shared partial ownership of airplanes that were occasionally hangared at Teterboro Airport in Bergen County.

Defendant James S. Chanos, Kynikos's founder and president, was a New York resident; he did not have a New Jersey mailing address, phone number or bank account. Chanos did not own property in New Jersey, and he was not obligated to file a personal income tax return in New Jersey. Like Kynikos, Chanos only filed partnership returns in connection with the airplanes in Bergen County.

In September 2000, defendant Jeffrey Perry, formerly of SAC, joined Kynikos as a co-manager. After an alleged "falling out" with Chanos, Perry left Kynikos in 2005 and joined Third Point as a senior analyst. He was a New York resident and had no New Jersey mailing address, phone number or bank account. Perry did not own property in, and did not regularly travel to, New Jersey. Although he paid New Jersey taxes in 2005 for earnings from an unrelated investment, he otherwise has not been obligated to file a personal income tax return in New Jersey.

Kynikos traded in Fairfax stock between March 2002 and June 2007, and in Odyssey stock between January 2006 and March 2007. Kynikos never held stock in, nor traded any interest in, C&F.

### (b) Third Point

Third Point — a Delaware limited liability company with its principal office in New York and a satellite office in California — was an employee-owned hedge fund that serviced

A-0963-12T1

pooled investments and institutional investors and had an investment relationship with the Exis defendants.

During the relevant period, Third Point provided management services to a number of funds that traded the securities of Fairfax and related entities. Those funds paid Third Point management fees; the funds themselves, however, are not parties to this suit and, in any event, had no New Jersey presence. The brokers who executed those trades were not located in New Jersey and no Third Point member resided in New Jersey.

Between 2002 and 2006, New Jersey residents comprised only four percent of the investors in Third Point's funds, and less than two percent of the cash Third Point managed belonged to New Jersey investors. Third Point paid New Jersey taxes on behalf of its investors, but the Third Point funds reimbursed those outlays; Third Point itself did not pay New Jersey taxes.

Third Point purchased services and products from New Jersey vendors, but those payments were minimal, representing less than one percent of Third Point's operating budgets between 2002 and 2007. Third Point was not registered to conduct business in New Jersey, did not own or lease property here, and did not have any New Jersey-based offices, mailing addresses, phone numbers or bank accounts. Third Point did not send general solicitations to New Jersey residents unless such information was requested.

A-0963-12T1

Defendant Daniel S. Loeb was the managing member and founder of Third Point and, as noted previously, Perry was a senior analyst. Both Loeb and Perry had their primary residences in New York and did not travel to New Jersey on a regular basis. Neither owned nor leased property in New Jersey or maintained a New Jersey mailing address or phone number.

Loeb had personal accounts with various New Jersey savings banks, but he was not required to pay New Jersey income taxes. Plaintiffs alleged that Loeb directed Perry to help Contogouris develop and disseminate false information about Fairfax's health.

Third Point traded extensively in the following entities and at the following times: (1) Fairfax, between June 2002 and February 2007; (2) Odyssey, between November 2005 and December 2006; (3) Northbridge Financial Corporation, a Fairfax subsidiary located in Canada, between June 2002 and November 2006; and (4) C&F, between July 2006 and April 2007. Third Point's trading of C&F-related interests amounted to only three percent of its overall Fairfax-related transactions. Those interests, however, consisted of bonds that were not issued by C&F; they were instead originally issued by non-party Crum & Forster Funding Corp., a Delaware corporation. C&F assumed those

A-0963-12T1

bonds on June 30, 2003, through a transaction conducted in New York purportedly in accordance with New York law.

Considering the contacts of the Kynikos and Third Point defendants, we conclude they are insufficient to give our courts general jurisdiction over them because the contacts do not constitute "continuous and systematic activities in the forum." Waste Mgmt., supra, 138 N.J. at 119.

## 2. Specific Jurisdiction

There being no basis upon which to assert general jurisdiction over these defendants, we consider whether they had specific contacts with persons or entities in New Jersey that relate to the alleged enterprise or conspiracy. Although we do not have the benefit of the trial judge's view of plaintiffs' specific allegations of communications by these defendants toward entities or persons in New Jersey, we have closely examined the record in light of the parties' arguments. We find any such communications to be so inconsequential as to justify rejection of the argument that the court was authorized to exercise specific jurisdiction over these defendants.

As for Kynikos, plaintiffs allude to a handful of communications it had with A.M. Best,[43] CNBC,[44] and "a New Jersey-based" Dow Jones reporter, Carol Redmond.[45] And, as for Third Point, other than what has already been discussed, plaintiffs refer to communications — a few days before plaintiffs commenced this suit between Third Point and A.M. Best, as well as a number of other individuals, only a few of whom may have been located in New Jersey — that attached an article from The New York Post concerning Fairfax.

These few communications are far too inconsequential to warrant the assertion of jurisdiction over these defendants.

### 3. Conspiracy-Based Jurisdiction

Plaintiffs also contend that the court was authorized to assert jurisdiction over these defendants because of the actions of other alleged co-conspirators.

---

[43] As for A.M. Best, the allegations seem to relate to a single email, which appears to have little significance to the issues at hand, since it appears to only pose questions about Fairfax subsidiaries other than C&F.

[44] Plaintiffs do not claim Kynikos had direct contact with CNBC in New Jersey. Rather, plaintiffs referred in their opposing papers in the trial court to communications with a financial journalist located outside New Jersey who occasionally appeared on a show on CNBC, which broadcasts from Englewood Cliffs.

[45] These communications related only to Kynikos's inclusion as a party to this lawsuit.

A-0963-12T1

The trial judge determined, as he explained in his December 23, 2011 written decision, that plaintiffs had to show defendants affirmatively injected themselves into New Jersey and that mere allegations of a conspiracy were insufficient to establish the requisite minimum contacts. The court also rejected plaintiffs' contention that Fairfax's injuries could be attributed to C&F for the purpose of analyzing minimum contacts and concluded that a "comment made as to a Canadian company cannot by inference be applied to any and all subsidiaries of Fairfax. That [w]ould unknowingly impose jurisdiction upon defendants anywhere throughout the world."

We review these summary determinations de novo. <u>Spring Creek Holding Co. v. Shinnihon U.S.A. Co.</u>, 399 <u>N.J. Super.</u> 158, 180 (App. Div.), <u>certif. denied</u>, 196 <u>N.J.</u> 85 (2008); <u>YA Global Invs., L.P. v. Cliff</u>, 419 <u>N.J. Super.</u> 1, 8 (App. Div. 2011). To survive these motions, plaintiffs were required to identify genuine disputes of material fact that could lead a rational factfinder to resolve the dispute in their favor. <u>Brill</u>, <u>supra</u>, 142 <u>N.J.</u> at 540; <u>Turner v. Wong</u>, 363 <u>N.J. Super.</u> 186, 198-99 (App. Div. 2003). Bare opposing conclusions and speculation are insufficient. <u>Brill</u>, <u>supra</u>, 142 <u>N.J.</u> at 541.

In applying this standard, we return to the legal principles that govern a court's exercise of personal

97

jurisdiction. To start, it is of course self-evident that a court lacking personal jurisdiction has no authority over the nonresident. Burger King Corp. v. Rudzewicz, 471 U.S. 462, 471-72, 105 S. Ct. 2174, 2181, 85 L. Ed. 2d 528, 540 (1985); McKesson Corp. v. Hackensack Med. Imaging, 197 N.J. 262, 275 (2009). Although New Jersey's long-arm provision permits our courts to assert jurisdiction over nonresidents, the use of that authority must comply with the due process limits imposed by the United States Constitution. Avdel Corp. v. Mecure, 58 N.J. 264, 268 (1971); Reliance Nat'l Ins. Co. in Liquidation v. Dana Transp., Inc., 376 N.J. Super. 537, 543 (App. Div. 2005).

As we have already observed, those limits recognize two types of personal jurisdiction, specific and general. Waste Mgmt., Inc., supra, 138 N.J. at 119. A nonresident's direct contacts with the forum may vest the court with specific jurisdiction; suits premised on a nonresident's continuous and systematic contacts give rise to general jurisdiction when they approximate an actual presence in the forum. Ibid.; Lebel v. Everglades Marina, Inc., 115 N.J. 317, 322-23 (1989).

In assessing the sufficiency of the relationship between the forum and the nonresident, the initial step examines two factors: whether minimum contacts exist at all and whether those contacts provide adequate grounds for asserting jurisdiction. If

a plaintiff demonstrates the existence of minimum contacts, the inquiry shifts to verifying that "the maintenance of the suit [would] not offend 'traditional notions of fair play and substantial justice.'" Int'l Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S. Ct. 154, 158, 90 L. Ed. 95, 102 (1945) (quoting Milliken v. Meyer, 311 U.S. 457, 463, 61 S. Ct. 339, 343, 85 L. Ed. 278, 283 (1940)); accord Blakey v. Cont'l Airlines, Inc., 164 N.J. 38, 71 (2000). Relevant factors in the "fair play" evaluation include "the burden on [the] defendant, the interests of the forum state, the plaintiff's interest in obtaining relief, the interstate judicial system's interest in efficient resolution of disputes, and the shared interest of the states in furthering fundamental substantive social policies." Waste Mgmt., supra, 138 N.J. at 124-25.

With respect to intentional torts, as alleged here, the question is whether an intentional act was "calculated to create an actionable event in a forum state." Blakey, supra, 164 N.J. at 67 (quoting Waste Mgmt., supra, 138 N.J. at 126). The Court recently reinforced in Walden v. Fiore, 571 U.S. 12, 14-15, 134 S. Ct. 1115, 1125, 188 L. Ed. 2d 12, 23 (2014), that the focus is on whether the nonresident "directed his conduct" at the plaintiff whom he knew had connections with the forum. The plaintiff "cannot be the only link between the defendant and the

forum." Id. at 14, 134 S. Ct. at 1122, 188 L. Ed. 2d at 21. It is "the defendant's conduct that must form the necessary connection with the forum State that is the basis for its jurisdiction over him." Ibid. As stated in Burger King, supra, 471 U.S. at 478, 105 S. Ct. at 2185, 85 L. Ed. 2d at 544-45, "[i]f the question is whether an individual's contact with an out-of-state party alone can automatically establish sufficient minimum contacts in the other party's home forum, we believe the answer clearly is that it cannot."

In Walden, supra, 571 U.S. at 15, 134 S. Ct. at 1122, 188 L. Ed. 2d at 21, the Court found, in searching for the "necessary connection" between the nonresident's conduct and the forum, no such link even though the defendant in Georgia might have known that the plaintiffs could have felt the impact of his conduct in the forum. On the other hand, in an earlier case, the Court found a sufficient nexus when Florida defendants published an allegedly libelous article about a California plaintiff knowing their publication had a subscription base of approximately 600,000 readers in California. Calder v. Jones, 465 U.S. 783, 785, 104 S. Ct. 1482, 1485, 79 L. Ed. 2d 804, 809-10 (1984). The principles emanating from these cases, and others, direct that we first determine whether those defendants seeking to justify the dismissal based on personal jurisdiction

had minimum contacts with New Jersey and, if so, whether those contacts represented deliberate attempts by those defendants to avail themselves of the forum. Lebel, supra, 115 N.J. at 322-24.

With respect to the first question — whether these defendants had minimum contact with New Jersey — plaintiffs rely heavily on their position that the in-forum contacts of a co-defendant can, as a matter of law, be imputed to other purported enterprise members by applying conspiracy or agency theories of liability. Although accepted in some courts, see Compania Brasileira Carbureto De Calicio v. Applied Indus. Materials Corp., 640 F.3d 369, 372 (D.C. Cir. 2011); Melea, Ltd. v. Jawer Sa, 511 F.3d 1060, 1069 (10th Cir. 2007); Lolavar v. De Santibanes, 430 F.3d 221, 229 (4th Cir. 2005); Textor v. Board of Regents of N. Ill. Univ., 711 F.2d 1387, 1392-93 (7th Cir. 1983), even those jurisdictions recognize that the theory might, at times, "subvert the due process principles that govern personal jurisdiction," Newsome v. Gallacher, 722 F.3d 1257, 1265 (10th Cir. 2013). Other courts have rejected the theory. See Ploense v. Electrolux Home Prods., 882 N.E.2d 653, 665-67 (Ill. App. 2007); OpenRisk, LLC v. Roston, 59 N.E.3d 456 (Mass. App. 2016); Nat'l Indus. Sand Ass'n v. Gibson, 897 S.W.2d 769, 773 (Tex. 1995). One commentator has argued that its use is unconstitutional:

101

> [B]efore [a court] may properly assert jurisdiction, [it] must find actual or constructive knowledge on the part of each defendant that the conspiracy could lead to the kind of significant contact with the state that would support jurisdiction. It cannot rely on a conspiracy "theory" to hold every individual defendant to the expectation of a particular forum simply because one of the alleged co-conspirators happened to choose that state as the place to perform an act.
>
> . . . .
>
> [I]nsofar as conspiracy theory becomes a device to bypass due process analysis, it is plainly unconstitutional.
>
> [Ann Althouse, The Use of Conspiracy Theory to Establish In Personam Jurisdiction: A Due Process Analysis, 52 Fordham L. Rev. 234, 253-54 (1983).]

See also Rhett Traband, The Case Against Applying the Co-Conspiracy Venue Theory in Private Securities Actions, 52 Rutgers L. Rev. 227, 262 (1999) (criticizing this conspiracy approach because of its tendency to rely on "self-serving and often conclusory allegations," and because it can result in subjecting a nonresident to "expedited and broad discovery," and the expenditure of funds "to defend in a forum with which the defendant had no contact"); Stuart Riback, Note, The Long Arm and Multiple Defendants: The Conspiracy Theory of In Personam Jurisdiction, 84 Colum. L. Rev. 506, 521 (1984) (concluding that "the conspiracy theory does not take into proper account the

International Shoe requirements [and] leads to undesirable and often unconstitutional results").

Plaintiffs mistakenly rely on State, Department of Treasury v. Qwest Communications International, Inc., 387 N.J. Super. 487 (App. Div. 2006), in support of this theory. There, the plaintiff sued Qwest and its executive officers for damages incurred when they allegedly conspired to inflate the price of Qwest's stock. Id. at 493-94. The plaintiff accused the individual defendants, who were executive officers responsible for approving defendant's financial statements for filing with the SEC, of intentionally disseminating false financial statements through the company's investor relations division as an inducement to invest. Id. at 501-02. Those nonresidents disputed personal jurisdiction on the ground that they had not known the company's investor relations division would transmit the disputed information to New Jersey investors. Ibid. We rejected the nonresidents' "individual protestations of ignorance," recognizing "that a 'conspiracy theory' of personal jurisdiction is based on the 'time[-]honored notion that the acts of [a] conspirator in furtherance of a conspiracy may be attributed to the other members of the conspiracy.'" Id. at 503 (quoting Textor, supra, 711 F.2d at 1392-93).

Even assuming this language was an endorsement of conspiracy-based personal jurisdiction, Qwest is distinguishable. There, "[t]he crux of the cause of action [was] the dissemination of fraudulent statements into this State that caused harm to NJT," a division of New Jersey's Department of Treasury. Id. at 499. The three individual defendants "all signed filings with the SEC that included allegedly false statements that induced NJT to purchase and hold Qwest stock. NJT received in New Jersey specific notice of those filings and accompanying press releases from Qwest's investor relations division that included statements from all three defendants." Id. at 501. We found it reasonable to infer that the defendants were aware of this system of dissemination to major investors such as NJT. Id. at 502. Thus, it was a reasonable "inference and imputation of knowledge that the investor relations division would transmit the false statements to" NJT in New Jersey. Id. at 504.

Here, by contrast, the crux of this alleged conspiracy was the dissemination of false statements to affect the financial markets in New York in order to cause harm to a Canadian corporation. These defendants did not make statements their alleged co-conspirators distributed into New Jersey. Importantly, there is no basis for an inference that these

104                                              A-0963-12T1

defendants were aware of any particular actions taken by their alleged co-conspirators in New Jersey. <u>See</u> <u>Glaros v. Perse</u>, 628 <u>F.</u>2d 679, 682 (1st Cir. 1980) (holding that the conspiracy theory of personal jurisdiction requires that "the out-of-state co-conspirator was or should have been aware" of the acts performed in the forum state in furtherance of the conspiracy); Althouse, <u>supra</u>, 52 <u>Fordham L. Rev.</u> at 253 (observing that "a court must find actual or constructive knowledge on the part of each defendant that the conspiracy could lead to the kind of significant contact with the state that would support jurisdiction").

Absent such evidence, we reject the blanket rule urged by plaintiffs in favor of a defendant-by-defendant approach. <u>Blakey</u>, <u>supra</u>, 164 <u>N.J.</u> at 66; <u>see also</u> <u>Lebel</u>, <u>supra</u>, 115 <u>N.J.</u> at 321-22 (rejecting a "'stream-of-commerce' theory of jurisdiction" and opting to "stay with the basics"). Indeed, in other cases involving multiple defendants, our Supreme Court has warned that

> if a suit contains multiple defendants, their individual contacts to the forum state cannot be aggregated to find minimum contacts for a single defendant. Similarly, jurisdiction over one defendant may not be based on the activities of another defendant, nor on the plaintiff's connection to the forum state. The requirements of minimum contacts analysis "must be met as to

each defendant over whom a state court exercises jurisdiction."

[Waste Mgmt., supra, 138 N.J. at 127 (quoting Rush v. Savchuk, 444 U.S. 320, 332, 100 S. Ct. 571, 579, 62 L. Ed. 2d 516, 527 (1980)).]

In applying this standard, we must reject plaintiffs' claims that courts may assert personal jurisdiction over these defendants based solely on actions that other defendants allegedly committed within New Jersey absent evidence these defendants knew or should have known their alleged co-conspirators would take action in this State.

Plaintiffs have referred to a variety of emails and text messages exchanged between the defendants who obtained dismissal for lack of personal jurisdiction and other defendants. "[C]ommunications with individuals and entities located in New Jersey alone," however, constitute "insufficient minimum contacts to establish personal jurisdiction over a defendant." Baanyan Software Servs., Inc. v. Kuncha, 433 N.J. Super. 466, 477 (App. Div. 2013). More importantly, the communications that plaintiffs highlight consist of information-sharing and speculation about the profitability of Fairfax's securities exchanges. There was nothing objectively actionable in the substance of the communications in which these defendants participated. Plaintiffs' claims otherwise are based entirely on

106                                              A-0963-12T1

speculation and innuendo and are wholly distinct from Qwest, supra, 387 N.J. Super. at 500, where the "gravamen of the conduct alleged [was] the communication" itself. At best, any discussions among these defendants were "peripheral to the conspiracy alleged" and do not form grounds for exercising personal jurisdiction. Id. at 503.

Apart from plaintiffs' inability to show that the Kynikos and Third Point defendants had significant contacts with New Jersey, plaintiffs have not shown that whatever limited contacts these defendants may have had with New Jersey were sufficiently "purposeful" to impose jurisdiction. Plaintiffs were required to demonstrate that the contacts of these nonresidents with New Jersey resulted from deliberate conduct. Lebel, supra, 115 N.J. at 322-24 (citing World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297-98, 100 S. Ct. 559, 567-68, 62 L. Ed. 2d 490, 501-02 (1980)). The goal of that requirement is to ensure predictability and to shield parties from being "haled into court in a foreign jurisdiction solely on the basis of random, fortuitous, or attenuated contacts or as a result of the unilateral activity of some other party." Waste Mgmt., supra, 138 N.J. at 121.

Plaintiffs claim that these defendants purposely availed themselves of New Jersey's benefits because, in their view,

defendants knew any harm to Fairfax would have a "cascading effect" that would extend to its subsidiaries, including the New Jersey-based C&F. Kynikos and Third Point's respective trading activities, however, belie plaintiffs' allegation that they specifically targeted C&F. In fact, Kynikos never held any investments in C&F. Third Point extensively traded securities related to Fairfax and many Fairfax's subsidiaries, but trades specific to C&F amounted to only three percent of those transactions.

Further, the bonds underlying those C&F trades were issued by Crum & Forster Funding Corp., a Delaware corporation, and then assumed by C&F. These facts are significant when viewed through the lens of the generally-accepted principle that the situs of intangible interests, like stock, is usually the state in which the entity is incorporated. State v. Garford Trucking, Inc., 4 N.J. 346, 351-53 (1950). Because the bonds in this matter were issued by out-of-state entities, they arguably never found themselves within New Jersey's borders. Thus, Third Point could not have "reasonably anticipate[d] being haled into court" in New Jersey based on C&F's assumption of the bonds. World-Wide Volkswagen, supra, 444 U.S. at 297, 100 S. Ct. at 567, 62 L. Ed. 2d at 501. Although relevant, even if those bonds could be deemed to have entered New Jersey, the mere presence of Third

Point's property in New Jersey, standing alone, does not establish jurisdiction; plaintiff was required to identify other facts to show minimum contacts. Shaffer v. Heitner, 433 U.S. 186, 209, 97 S. Ct. 2569, 2582, 53 L. Ed. 2d 683, 701 (1977); Appaloosa Inv., L.P.I. v. J.P. Morgan Sec., Inc., 398 N.J. Super. 52, 58 (App. Div. 2008). Given the number of Fairfax-related entities in which Third Point traded, the transactions involving C&F are not significant; that Third Point's trading of C&F-related interests represented only three percent of its overall Fairfax holdings, and that those trades involved bonds that at the time of purchase were issued outside the state, defeat plaintiff's claim that Third Point set out to harm C&F.

Focusing on C&F's lost customers does not alter the result. There is no more evidence that those relationships were targeted through specific conduct in New Jersey or that defendants' conduct was geared toward causing an effect in New Jersey than there was in Walden, where the defendant's conduct in Georgia interfered with the plaintiffs' possession of money they brought with them on a flight from Puerto Rico to Georgia, with an intention to travel on to either of their residences in California and Nevada:

> [Plaintiffs'] claimed injury does not evince
> a connection between [defendant] and Nevada.
> Even if we consider the continuation of the
> seizure in Georgia to be a distinct injury,

A-0963-12T1

it is not the sort of effect that is tethered to Nevada in any meaningful way. [Plaintiffs] and only [plaintiffs] lacked access to their funds in Nevada not because anything independently occurred there, but because Nevada is where respondents chose to be at a time when they desired to use the funds seized by [defendant]. . . . Unlike the broad publication of the forum-focused story in <u>Calder</u>, the effects of [defendant's] conduct on [plaintiffs] are not connected to the forum State in a way that makes those effects a proper basis for jurisdiction.

[<u>Walden</u>, <u>supra</u>, 571 <u>U.S.</u> at 23, 134 <u>S. Ct.</u> at 1125, 188 <u>L. Ed.</u> 2d at 23-24.]

Mere "random" and "attenuated contacts" with New Jersey are insufficient. <u>Waste Mgmt.</u>, <u>supra</u>, 138 <u>N.J.</u> at 121; <u>Baanyan</u>, <u>supra</u>, 433 <u>N.J. Super.</u> at 475. Plaintiffs rely on the fact that C&F was a facet of Fairfax's consolidated financial statements in arguing that an attack on one entity was an attack on another or all. But they also recognize that harm to C&F was a byproduct and "cascading effect" of Fairfax's injuries. Therefore, unlike <u>Qwest</u>, <u>supra</u>, 387 <u>N.J. Super.</u> at 503, where there was a direct link between the defendants' financial misrepresentations and the impact to the New Jersey plaintiff, the harm to C&F, and thus to New Jersey, was largely derivative of that to Fairfax. Plaintiffs cite to authorities which are inapposite because in those cases the defendants knew their conduct would have a New Jersey impact. <u>See</u> <u>Blakey</u>, <u>supra</u>, 164 <u>N.J.</u> at 46 (finding "that

A-0963-12T1

defendants who published defamatory electronic messages, with knowledge that the messages would be published in New Jersey and could influence a claimant's efforts to seek a remedy under New Jersey's Law Against Discrimination, may properly be subject to the State's jurisdiction"); Lebel, supra, 115 N.J. at 320 (considering that the defendant actively solicited the business of a New Jersey plaintiff); Goldhaber v. Kohlenberg, 395 N.J. Super. 380, 389-90 (App. Div. 2007) (recognizing that the defendant "not only knew that plaintiffs resided in New Jersey, he knew the municipality in which they resided and made specific disparaging references to that municipality in many of his postings"); cf. Matsumoto v. Matsumoto, 335 N.J. Super. 174, 180-85 (App. Div.) (holding there was no personal jurisdiction over a foreign national who helped her son in an out-of-state conspiracy to violate his former wife's custody rights under their New Jersey divorce decree, even if she had retained title to the New Jersey marital home), aff'd in part, mod. in part on other grounds, 171 N.J. 110 (2000).

In many ways, plaintiffs seek to base jurisdiction for their claims against these defendants on the in-forum contacts of plaintiff's own subsidiary, C&F. By this logic, defendants would be subject to jurisdiction in any forum in which plaintiff had a subsidiary. Imposing jurisdiction on such "random" and

"fortuitous" grounds would undermine the due process considerations on which the minimum contacts analysis is based. See Waste Mgmt., supra, 138 N.J. at 121; see also Kulko v. Superior Ct. of Cal., 436 U.S. 84, 93-94, 98 S. Ct. 1690, 1698, 56 L. Ed. 2d 132, 142 (1978). Indeed, such an exercise of personal jurisdiction is precluded by well-established due process principles. Walden, supra, 571 U.S. at 15, 134 S. Ct. at 1122, 188 L. Ed. 2d at 21 (holding that "plaintiff cannot be the only link between the defendant and the forum").

### 4. Summary

There being no grounds for the assertion of general jurisdiction, plaintiffs were required to demonstrate, in support of the exercise of specific jurisdiction or in support of their conspiracy-based theory of jurisdiction, that these defendants "purposefully availed [them]sel[ves] of the privilege of engaging in activities within the forum state, thereby gaining the benefits and protections of its laws." Waste Mgmt., supra, 138 N.J. at 120-21. For the reasons we have discussed, we conclude that these defendants could not have reasonably anticipated "being haled into court in a foreign jurisdiction solely on the basis of [the] random, fortuitous, or attenunated contacts" asserted here. Id. at 121.

We affirm the dismissal of the Kynikos and Third Point defendants on personal jurisdiction grounds.

## D

## THE SUMMARY JUDGMENTS
## IN FAVOR OF THE SAC DEFENDANTS
## AND THE ROCKER DEFENDANTS

Plaintiffs also contend that the trial court erred in granting summary judgment to the SAC defendants and the Rocker defendants. We view these matters separately.

### 1. The SAC Defendants

### (a) The Parties' Arguments

In granting summary judgment in favor of the SAC defendants, the trial court concluded that SAC had not engaged in short-selling Fairfax equity securities and would actually "stand to lose" money if the alleged scheme succeeded. Plaintiffs, however, rely on evidence that suggests the SAC defendants worked with enterprise members to try to find a negative catalyst to drive Fairfax's stock price down, and, after receiving non-public information of the anticipated adverse report by Morgan Keegan, Cohen and Sigma Capital Management, L.L.C., maintained or added to their short positions in Fairfax so they could profitably cover the stock price drop that would result when that report became public. Plaintiffs

assert the record further shows the SAC defendants continued participation in the conspiracy in 2003 to 2006, well beyond the initial acts, by increased investments in Exis. In general, plaintiffs claim the trial judge erred in failing to give them the benefit of all favorable inferences regarding these facts, and, in that way, assumed or usurped the jury's fact-finding role.

The SAC defendants argue that, unlike the other defendants that conceded trading in or communicating about Fairfax, they denied "any significant trading in Fairfax securities or having worked with or even communicated with the other [d]efendants regarding Fairfax." They reject plaintiffs' characterization that Contogouris admitted a relationship with the SAC defendants, noting that Contogouris's testimony, in context, constituted a denial that he spoke with defendant Cohen about Fairfax.

The SAC defendants also argue that, for the entirety of the alleged conspiracy, its economic interests in Fairfax were "either neutral or aligned with Fairfax's," a circumstance that would conclusively demonstrate they "had no economic interest in seeing the so-called conspiracy succeed." SAC invested in Fairfax prior in time to when plaintiffs allege the conspiracy began; SAC was closing that short position in early 2003, and by

A-0963-12T1

mid-September 2003 had "completely closed" its short position in Fairfax. A long-position purchase in 2004 aligned SAC's interests with Fairfax and, therefore, contrary to the purposes of the alleged conspiracy. SAC had no position in Fairfax in 2005, and considered its subsequent short positions inconsequential. And, to the extent SAC invested in outside entities, such as Exis and Bridger Capital Management, which both had invested in Fairfax, the SAC defendants assert these were inconsequential, and they denied control of or communications about them with anyone relevant to the alleged conspiracy. The SAC defendants therefore contend plaintiffs failed to meet their burden of showing that they "purposefully and knowingly" engaged in a conspiracy, supported by permissible inferences in plaintiffs' favor that were not "inherently implausible," and that the trial judge was correct in dismissing the claims asserted against the SAC defendants.

### (b) The Trial Judge's Ruling

The trial judge agreed with the SAC defendants' view. In September 2011, the judge determined that although over 200 "disputed facts" were presented, "there really appears to be nothing more than broad speculation based on circumstantial evidence" and plaintiffs failed to suggest "any inferences based upon reasonable facts and evidence" that would suggest

A-0963-12T1

otherwise. The judge, instead, believed plaintiffs had "tr[ied] to distort the record in an attempt to create their speculative assertions," and concluded that "the evidence on record is not enough to support a <u>rational</u> finding that whatever disputed issues are alleged by plaintiffs, can be found in favor of Fairfax." The court recognized that New Jersey's RICO and civil conspiracy laws can be viewed with leniency, allowing for some inferences because activities may have taken place "behind closed doors," but basing a case entirely "on pure speculation is too big of a leap to take." The trial judge added:

> Plaintiffs have pointed to no direct evidence which establishes a conspiracy of which SAC was a part. . . . Most tellingly, is SAC's trading reports in Fairfax securities. The fact that at no time did SAC trade similarly to its alleged [e]nterprise [m]embers is baffling, and without explanation by plaintiffs. It does not make sense that the alleged leader of the conspiracy would not only NOT act as its alleged cohorts did, but in fact, stand to lose money as a result of the allege[d] conspiracy.

Finding "no direct evidence of any sort of conspiracy involving SAC to take down Fairfax, and any allegation of such," viewing plaintiffs' allegations as "too much speculation based on circumstantial evidence to get past summary judgment," and concluding "[t]here is simply no evidence of motivation of [the]

SAC [defendants] to participate, much less coordinate the 'conspiracy,'" the judge granted summary judgment.

### (c) Our Holding

We disagree. The judge was presented with a forty-eight page list of the statement of items relevant to the motion. To be sure, mere quantity will not tilt the scale, but summary judgment is "too fragile a foundation," Grow Co. v. Chokshi, 403 N.J. Super. 443, 470 (App. Div. 2008) (quoting Petition of Bloomfield S.S. Co., 298 F. Supp. 1239, 1242 (S.D.N.Y. 1969), aff'd, 422 F.2d 728 (2d Cir. 1970)), for a disposition on the merits here. Indeed, there are assertions in the factual record that raise genuine issues regarding the claim of the SAC defendants' participation in the scheme as to preclude summary judgment regardless of the extraordinary size of the record.

The expert opinion submitted by plaintiffs could support a factfinder's determination that SAC took certain short positions that gave it financial goals aligned with the alleged conspiracy. In a certification submitted in response to the SAC defendants' motion, plaintiffs' expert, Stanley Fortgang,[46] opined that SAC had a "substantial known short interest in

---

[46] Fortgang was a consultant with approximately twenty-five years experience trading equities, bonds, and other securities for securities firms and hedge funds.

Fairfax throughout the duration of the conspiracy and a significant financial incentive to have acted in concert with other defendants and enterprise members in furtherance of the conspiracy." He also explained that the SAC defendants "collaborated with other defendants and enterprise members with respect to their trading in Fairfax in order to depress the price of Fairfax stock, and profit from its short positions." These bald assertions were not enough to defeat summary judgment, but Fortgang observed that, in moving for summary judgment, the SAC defendants

> conveniently ignore[] trading in Fairfax's related entities, specifically Odyssey . . . under the ticker symbol ORH. However, the ledger of ORH trades shows that [SAC] held a short position in ORH during April 2002, from June 2002 through February 23, 2004 (excepting for 2 distinct periods totaling approximately 30 days) and from July 2005 to September 2006 (except for a 15 day period from late July through early August 2006).

Fortgang explained that the "stock price of Fairfax and Odyssey are directly related such that a conspiracy to manipulate the price of Fairfax could certainly include trading in ORH." He further found it "significant enough to justify its conduct" in the alleged conspiracy that SAC held a significant interest in outside funds including Exis and Bridger. SAC was Exis's largest investor and, through Exis, indirectly possessed short positions in Fairfax. And, according to Contogouris,

Exis's "head analyst," defendant Steven Cohen had frequent communications with him.

Fortgang explained how this could be significant even where SAC's actual trading activity differed from the activity of other defendants:

> [SAC] is well known in the marketplace for having a unique and distinct trading strategy more focused on short term gains than other [d]efendants. It is therefore reasonable to conclude that while pursuing its own trading strategy, [SAC] traded in collaboration with the enterprise despite the fact that their trading records are not identical to other enterprise members[].

He added that the trading records showed that SAC "was certainly involved in trading on specific days and in the same direction as other defendants" and that the record further shows that many of those trades occurred "at times when significant communication occurred among the enterprise members." Fortgang further alluded to the fact that the SAC defendants' expert focused only on whether there was coordination with other defendants and enterprise members "over long periods of time," noting that instead SAC could have chosen to "coordinate[] its trading at specific critical time periods." SAC's trading approach was, nevertheless, "consistent with a stock manipulation scheme designed to profit from the artificially depressed price of [Fairfax] and [Odyssey] stock . . . ." Even

A-0963-12T1

SAC's trading expert, Denise Martin, "concedes that a possible short strategy to take advantage of an anticipated negative event could be . . . to cover a short position in advance of that event after the anticipation of that event has already had an effect on the stock price."

These contentions are further illuminated by SAC's guilty plea to a 2013 federal indictment, in which SAC admitted widespread solicitation and use of illegal inside information and insider trading, for which it agreed to pay an aggregate financial penalty of $1.8 billion and agreed to terminate the investment advisory businesses of several named SAC entities.[47] Although this settlement occurred in November 2013, the stipulation and order of settlement recites that the period during which insider trading took place was between 1999 through at least in or about 2010, thus including the period relevant to plaintiffs' allegations.

Plaintiffs' statement of material facts submitted in response to the SAC defendants' motion, includes numerous pages citing to and quoting documents describing SAC's early shorting of Fairfax in late 2002, its coordination with other alleged

_____

[47] United States v. S.A.C. Capital Advisors, L.P., 13 Cr. 541 (LTS), 13 Civ. 5182 (RJS) (S.D.N.Y. Nov. 2013), available at https://www.justice.gov/usao-sdny/pr/sac-capital-management-companies-plead-guilty-insider-trading-charges-manhattan-federal?print=1.

A-0963-12T1

enterprise members regarding Fairfax and the need for a "catalyst" for short sellers, and its involvement in contacting analysts and reporters with an intent to trade ahead of negative articles. Citing to emails and SAC trading ledgers, plaintiffs claimed that SAC and its Bridger Capital account shorted in advance of an expected Canadian Imperial Bank of Commerce report by Quentin Broad on Fairfax, and SAC's Sigma account began covering when it appeared that Broad's report would be delayed, but it then began "reshorting those covered shares after learning about the imminent publication of the Gwynn report," covering at least 500 shares "at a drastically lower price — near the low of the day — after Gwynn published his report."

Plaintiffs further described various contacts between SAC representatives and Morgan Keegan, including a request in September 2003 for a reminder of what Gwynn had said about Fairfax's use of finite insurance. Plaintiffs also cited to SAC's $48 million interest as of May 2004 in Exis's Walrus Fund, Exis's employment of Contogouris in March 2005 to work on Fairfax, and the fact that Steven Cohen knew Contogouris from his prior experience with him on the Hanover Compressor investment as to which defendant Cohen took a short position based on insider information from Contogouris. Accordingly, plaintiffs relied on Contogouris's assertion that in the spring

A-0963-12T1

of 2006, SAC "called Sender and wanted some of . . . [Contogouris's] research." Based on the information gleaned through Contogouris's work on behalf of the alleged enterprise, plaintiffs were entitled to an inference that the SAC defendants were able to reap "substantial profitable returns from massive short positions that S.A.C.-related funds had assumed in Fairfax . . . ."

Plaintiffs also asserted that, although the SAC defendants "attempt[] to narrowly interpret the relevant trading activity in an effort to minimize the extent of its involvement in trading Fairfax securities, the trading records produced by the [SAC] [d]efendants show thousands of trades in Fairfax, including short trades that are not individually reflected in the [Fairfax] Ledger." Additional extensive trading was seen in Odyssey shares, and in options trades with Fairfax's stock — a lower cost way to "synthetically short Fairfax." Plaintiffs asserted that although SAC at times "took smaller and more short-term positions than other defendants, it often traded on the same days and in the same directions as those defendants," citing a March 2006 SAC short position taken in Fairfax. Consequently, plaintiffs contend the trading records "demonstrate the opposite of what they have stated" in moving for summary judgment.

A-0963-12T1

Considering that the matter was disposed of by way of summary judgment, and considering that we, too, are obligated to apply the Brill standard, see, e.g., Murray v. Plainfield Rescue Squad, 210 N.J. 581, 584 (2012), we conclude there are genuine factual disputes that precluded summary judgment. We agree with plaintiffs that the trial judge overlooked or otherwise resolved material factual disputes about SAC's trading during the period of the alleged enterprise. To be sure, at the conclusion of a trial, the factfinder could choose to reject Fortgang's conclusions and find plaintiffs' interpretations of the facts less credible than others it may hear, Poliseno v. General Motors Corp., 328 N.J. Super. 41, 59 (App. Div.), certif. denied, 165 N.J. 138 (2000), but for purposes of summary judgment, plaintiffs were entitled to the benefit of the doubt on those matters.

## 2. The Rocker Defendants

### (a) The Parties' Arguments

Plaintiffs contend that, in granting summary judgment to the Rocker defendants, the judge erred because judgment was granted years before discovery was completed — indeed, before any depositions were taken — and because the judge relied on the opinion of a discovery master, who, in plaintiffs' view, improperly resolved disputed factual issues and incorporated his

personal view of how securities markets operate in concluding that "Rocker's quick reaction to the negative report it received about Fairfax is hardly out of the ordinary." That conclusion purported to resolve disputed questions about when the Morgan Keegan report was officially published, when Rocker traded, and what inferences could be drawn from the "speed and aggressiveness" of Rocker's trades at and around the time of the report's publication.

A discovery master found that Rocker began trading ten minutes after receiving word about the report, and without having seen the report. Plaintiffs contend these facts supported an inference that the Rocker defendants had prior knowledge of the report and the further inference that they were engaged in the conspiracy. Moreover, plaintiffs assert that the discovery master relied upon an in camera review of Rocker's detailed trading records, which plaintiffs were not permitted to see and thus could not test. Plaintiffs additionally argue that the trial judge erred by improperly limiting the relevant issues for Rocker's participation in the conspiracy to just two events: (1) paying Contogouris, and (2) trading in advance of Morgan Keegan's initial January 2003 report.

## (b) The Trial Judge's Ruling

To be sure, the resolution of the claims against the Rocker defendants was unusual. In considering dispositive motions in 2007, the trial judge stated a number of times: "I still don't know what the Rocker defendants did." She asked plaintiffs' counsel how quickly he could depose David Rocker if the motion to dismiss were to be denied, and counsel responded he could perhaps address the issue with more specific pleading, which was to be accomplished within two weeks, if needed. In clarifying and restating what would occur next, the trial judge stated that she would deny Rocker's motion, without prejudice, and that plaintiffs' and Rocker's counsel should talk. The judge added:

> If you haven't been able to work it out, he's going to amend the complaint. Yours is going to be the first deposition, and you can re[-]move . . . and . . . incorporate the papers that you've already submitted, with just . . . a summary brief on what happened as far as the new pleading, and — I'm trying to make it as inexpensive as possible.

The Rocker defendants again moved for dismissal because plaintiffs did not avail themselves of the opportunity to depose Rocker. At the beginning of the argument, the court set forth the procedural background for the motion, specifically regarding the assertion by plaintiffs' counsel that plaintiffs "haven't had a chance to take the Rocker depositions." The trial judge

A-0963-12T1

stated "that's not accurate[,] . . . just simply not accurate"; she explained that, on September 7, 2007, "over a year ago, I told the plaintiffs to take Mr. Rocker's deposition."

The trial judge recalled having been "ready to dismiss them on their motion to dismiss a year ago," but plaintiffs were given the time they requested to get together documents which would show a good faith basis for Rocker's continued inclusion as defendants. The judge recalled having told plaintiffs' counsel "to share the evidence that they had with counsel for that particular defendant and if they didn't have a good faith basis for having them in the suit they should be dismissed." And she added, that she "didn't expect them to have to come in here and make another motion." More specifically, with regard to the Rocker defendants, the judge expressed that she "was assured that plaintiffs had a good faith basis, that somebody had given them the information." And she then recounted that she "said, . . . show them what it is, get it in the complaint, . . . and take a deposition" so that only individuals and entities that rightly belonged in the case would remain.

At the motion's conclusion, the judge ruled that: "The Rocker defendants are going to be dismissed from the suit without prejudice to an amended complaint being filed that comes forth with some specific conduct." The judge relied on her

126

conclusion that the proofs of any wrongdoing by the Rocker defendants in December 2002 were "too slippery and too tenuous," and were further attenuated by the Rocker defendants' contentions that they engaged in no trading as to Fairfax in December 2002 and had no Fairfax position until January 17, 2003. The trial judge was further troubled by plaintiffs' failure to provide clear evidence as to when the Morgan Keegan report was published, even though their arguments as to the Rocker defendants assumed an afternoon publication on January 17, 2003.

The judge's decision also acknowledged "there may very well be reason[s] for bringing Rocker back into the complaint," if the discovery master's review showed some culpability. At the time, however, the judge found "there's really nothing" that implicated the Rocker defendants and rejected an inference of culpability just because Rocker and Chanos had a longtime friendship. As to plaintiffs' allegation that Rocker paid Contogouris to do the things he did to hurt Fairfax, "if that is so, there has to be something before March of 2007 to link them," and the judge was shown no evidence of any such link.

In December 2011, after the conclusion of discovery, the trial judge converted the summary judgment to a dismissal with prejudice, explaining that plaintiffs had failed to develop any

A-0963-12T1

evidence to support the claims asserted against the Rocker defendants.

### (c) Our Holding

The manner in which the action against the Rocker defendants was disposed of is foreign to us. The problem is that the judge's "dismissal without prejudice" put the claims against the Rocker defendants in the unusual position of being neither in nor out, neither fish nor fowl. For these reasons, plaintiffs have argued that summary judgment was prematurely granted and, with no support, contend the Rocker defendants stonewalled them on discovery before a discovery master could look into the issues they raised.

It is clear to us that the trial judge dismissed with prejudice only after plaintiffs had a full and fair opportunity to obtain further discovery from the Rocker defendants and as to their alleged involvement. Plaintiffs also have presented very little about what they expected to find, so it all truly does seem more like a fishing expedition. With the vast amount of discovery available as it came from other parties, the trial judge was not unreasonable in believing plaintiffs had not sufficiently shown there was a sound basis for keeping the Rocker defendants in the case. With the completion of discovery

A-0963-12T1

years later, there is nothing to suggest any substance to plaintiffs' claims against the Rocker defendants.

Consequently, we conclude that the trial judge did not err in granting summary judgment to the Rocker defendants, and we find plaintiffs' arguments to be without sufficient merit to warrant further discussion in this opinion. R. 2:11-3(e)(1)(E).

E

**LOST PROFITS AND
THE ELSON REPORTS**

In September 2012, the last judge to preside over the matter addressed the maintainability of plaintiffs' disparagement claim. The judge found sufficient evidence for a jury to find that defendants had intended to harm plaintiffs' interests; he further found those interests consisted of plaintiffs' "ability to sell their insurance policies," which involved their "actual business dealings" rather than just their reputations. Product disparagement, however, as we have held, required proof of "special damages," and the trial judge ruled that only one alleged kind of loss could satisfy it, namely, C&F's injury from "products that were not sold." He concluded that plaintiffs' general financial losses, such as losses arising from plaintiffs' offering of securities or the market trading in their securities, were the indirect results of

defendants' disparagement rather than the "direct and immediate" results of more targeted misconduct, and therefore could not be included in the disparagement claim. The judge found the same was true of plaintiffs' increased auditing costs and D&O insurance premiums, plaintiffs' inability to finance strategic acquisitions, and any legal costs. As a general matter, we agree with this conceptualization.

These rulings narrowed the alleged cognizable "special damages" to C&F's lost customers. Plaintiffs proffered Echemendia's in-house report that named approximately 180 lost customers from whom C&F would have earned profits of $19 million. Earlier, we concluded that plaintiffs' assertions as to the 180 alleged lost customers were sufficient to survive summary judgment. See Section IV(B)(3), supra.

But plaintiffs also offered Craig Elson's expert report on the value of the share of the insurance market that C&F would have secured but for defendants' alleged misconduct. The trial judge found Elson's expert report to be a net opinion, which failed to show the special damages required by law, leaving only the 180 lost customers named in Echemendia's report. As to those customers, the judge found "a complete absence of proof that any of the brokers in question actually made the decision . . . not to sell [C&F] insurance" products "based on the alleged

statements," i.e., a failure of proof on proximate cause, which compelled dismissal of what remained of plaintiffs' entire case.

We reject the judge's determination that plaintiffs could not continue to pursue its claim to the 180 alleged lost customers for reasons already expressed, but we agree with the argument that Elson's theory of recovery as to a lost market share cannot constitute damages permitted by way of plaintiffs' New York common law claims because New York law requires proof of the specific customers whose present or future relationship with plaintiffs was impinged, frustrated or precluded. It is for this reason alone that we affirm the judge's determination to bar the testimony Elson would have provided had the case gone to trial.

Although not necessary for our disposition of the appeal concerning Elson's report, we nevertheless consider and address other concerns about that report and Elson's proposed expert testimony. The judge, as we have noted, barred Elson's expert testimony because he found it to be a net opinion. Plaintiffs additionally argue the trial judge erred in failing to conduct a hearing pursuant to N.J.R.E. 104. We agree the judge erred in finding Elson's proposed testimony constituted a net opinion but we find no error in the judge's decision not to conduct a N.J.R.E. 104 hearing.

131                                                         A-0963-12T1

## 1. General Principles

N.J.R.E. 702 provides that when "scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise." Although the facts upon which a qualified expert's testimony is based need not be admissible, those facts must be "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." N.J.R.E. 703. Consequently, expert opinions must satisfy three requirements:

> (1) the intended testimony must concern a subject matter that is beyond the ken of the average juror;
>
> (2) the field testified to must be at a state of the art such that an expert's testimony could be sufficiently reliable; and
>
> (3) the witness must have sufficient expertise to offer the intended testimony.
>
> [Landrigan v. Celotex Corp., 127 N.J. 404, 413 (1992).]

A corollary of these principles — the net opinion rule — forbids the admission of an expert's conclusions when unsupported by factual evidence or other data. State v.

Townsend, 186 N.J. 473, 494 (2006). An expert witness is required "to give the why and wherefore of [an] expert opinion, not just a mere conclusion." Jimenez v. GNOC, Corp., 286 N.J. Super. 533, 540 (App. Div.), certif. denied, 145 N.J. 374 (1996). The "key to admission" is the validity of the expert's "reasoning and methodology," and in that regard, a court's function "is to distinguish scientifically sound reasoning from that of the self-validating expert, who uses scientific terminology to present unsubstantiated personal beliefs." Landrigan, supra, 127 N.J. at 414.

## 2. The Judge's Disposition
## Of the In Limine Motion Regarding
## Elson's Expert Testimony

Even in relatively simple cases, determining whether a proffered expert opinion passes the "why and wherefore" test described above often proves difficult. On appeal, a dispute about admissibility — even considering an appellate court's reticence in intervening absent an abuse of discretion, Hisenaj v. Kuehner, 194 N.J. 6, 16 (2008) — can prove perplexing. See, e.g., Townsend, supra, 221 N.J. at 53-57. And it doesn't get any better when a trial judge has failed to fully explain the grounds for exclusion; such is the case here.

The trial judge found Elson lacked the requisite expertise because, although highly educated, he did not possess experience

in the insurance industry. The judge also deemed Elson's methodology to be unreliable by highlighting the lack of any objective data or evidence to demonstrate a causal link between an insurance company's rating and its market share growth. The trial judge, however, did little more than express this view in a conclusory fashion.

On the return date of an in limine motion, the judge provided only the following to guide us in determining whether he soundly exercised his discretion. First, the judge stated that "Mr. Elson is an MBA with no experience in the insurance business or anything relating to the insurance business at all[,] as is clear from his report and perfectly clear from his testimony." The judge then referred to an obligation "in cases of this kind" for a plaintiff — whether applying New York or New Jersey law — to prove "actual loss of business." The judge followed that with an acknowledgement that "New Jersey law allows for an alternative approach when you can't prove . . . actual lost business." But, because, as the judge observed, "plaintiff was capable of proving actual loss of business involving approximately 180 producers of business, who it claims chose not to place insurance with [C&F] subsidiaries because of the so-called noise or negativity in the market," he apparently concluded that plaintiffs could not take an alternative approach

A-0963-12T1

when actual lost business cannot be proven. And the judge lastly, through citation to some brief excerpts from Elson's deposition testimony, found Elson's methodology — viewed as being based on a "proposition that because companies are similarly rated by rating agencies and are similar in various respects, that, therefore, they would have grown at the same rate" — to constitute a theory that is "counterintuitive" and "simply . . . not supported by any standard."

The judge's brief oral decision provides little that demonstrates to us how — in this particularly complex aspect of the case — the expert's opinion should be barred for theoretical reasons. The judge's opinion does not demonstrate how Elson's opinion is "counterintuitive" or unsupported by known standards.

The judge stated at the outset of his oral decision that he would "expand" on his reasoning by way of "a written opinion to follow," but that written opinion never issued. If Elson's testimony was not barred because of the application of New York law, and if admissibility turned on the net-opinion determination, we would simply remand for further amplification from the trial judge on this question. But, in light of the considerable time, expense and energy devoted to bringing the case to this point, we instead have analyzed the parties' arguments about the sufficiency of Elson's credentials and

135

A-0963-12T1

methodology. Based upon our review of the record, we conclude his expert testimony did not constitute one or more net opinions, although, as we have already mentioned, the damages claimed by way of the Elson report are not recoverable.

### 3. Our Ruling

Elson provided two detailed expert reports that were explored at a lengthy deposition. In essence, he compared C&F's sales and growth rates to comparable competitors. Except in certain respects not relevant here, the admissibility of evidence is governed by the law of the forum. See Restatement (Second), supra, § 138.

Elson may not have previously provided an opinion of this nature in the insurance setting — a fact greatly relied upon by the trial judge[48] — but that is not dispositive. See Quinlan v. Curtiss-Wright Corp., 425 N.J. Super. 335, 372 (App. Div. 2012) (observing that it "was not necessary for . . . a well-qualified economist quantifying plaintiff's alleged losses [to also] be an expert on employability"); see also Hammond v. Int'l Harvester Co., 691 F.2d 646, 652-53 (3d Cir. 1982) (holding that an engineer, whose only qualifications were sales experience in the

_____

[48] The trial judge held: "In order to give expert testimony . . . you have to have knowledge, experience, training, something in the area about which you're testifying. He has nothing with respect to insurance, nothing at all."

field of automatic and agricultural equipment and teaching high school automobile repair, could testify in a products liability action involving tractors); <u>Knight v. Otis Elevator Co.</u>, 596 <u>F.</u>2d 84, 87-88 (3d Cir. 1979) (holding that an expert could testify that unguarded elevator buttons constituted a design defect despite the expert's lack of a specific background in design and manufacture of elevators). Although the determination as to whether our evidence rules permit admission of a particular expert's testimony lies within the sound exercise of the trial judge's discretion, <u>see</u> <u>Hisenaj</u>, <u>supra</u>, 194 <u>N.J.</u> at 16, we agree the trial judge mistakenly rested his order excluding Elson's testimony on Elson's lack of expertise in the insurance industry. Any gaps in his conclusions about the damage caused to C&F that were dependent on the jury's understanding of the insurance industry could be supplied by other witnesses or evidence, as <u>N.J.R.E.</u> 703 clearly permits. <u>See</u>, <u>e.g.</u>, <u>Indus. Dev. Assocs. v. Commercial Union Surplus Lines Ins. Co.</u>, 222 <u>N.J. Super.</u> 281, 296-97 (App. Div. 1988). Consequently, we conclude the trial judge mistakenly exercised his discretion in excluding Elson's testimony solely on the basis of his lack of expertise in the insurance industry.

The judge also excluded Elson's testimony on another premise. The judge recognized that a plaintiff may prove damages

in this context without showing an "actual loss of business" but, because plaintiffs were able to show the loss of business from approximately 180 producers of business, they could no longer take advantage of a looser standard for damages when the claim is a loss of prospective business. We agree, as we have already held, that a looser standard for damages is barred by the application of New York substantive law to this claim.

The trial judge lastly based his determination on Elson's methodology. He said: "[t]here is nothing in his first report or his reply report that supports the proposition that because companies are similarly related by rating agencies and are similar in various respects, that, therefore, they would have grown at the same rate." Our review of the lengthy and detailed reports reveals that Elson compared C&F's actual performance with the actual weighted average performance of peer companies that were sufficiently similar to provide a meaningful comparison for the benefit of the factfinder. Although significantly more complex than other cases routinely heard and considered by our courts, we see nothing more disqualifying about Elson's methodology than we would with an appraiser quantifying an injury to real estate through comparison to another similar parcel of property, or in quantifying an injury to a restaurant by comparing it to another similar restaurant.

    A-0963-12T1

See, e.g., RSB Lab. Servs., Inc. v. BSI, Corp., 368 N.J. Super. 540, 551-53 (App. Div. 2004).

Elson identified those business lines most susceptible to the information disseminated by defendants and then ascertained a similar group of businesses — what he referred to as a cohort group — that compete with C&F in those areas. He then drew conclusions based on the performances of the cohort group in those areas and through consideration of numerous other factors, including historical performance, the ratings provided by entities whose opinions are of a type relied upon in the industry, as well as underwriting strategy, appetite for risk, and product pricing. In calculating the results of these comparisons, Elson determined the weighted average of these cohorts in the specific markets identified and compared that to C&F's performance in those markets to calculate damages. We find nothing disqualifying about Elson's approach.

For the reasons we have outlined, we draw the following conclusions. First, Elson's expert testimony is barred by the application of New York law. But, second, if New Jersey substantive law governed plaintiffs' common law claims, a different conclusion may have been warranted[49] because it has not

---

[49] As a matter of New Jersey law, a plaintiff's inability to fix "with precision" its lost-profits damages may not always

(continued)

been shown that Elson lacked the necessary qualifications or that he provided only net opinions.[50]

---

(continued)
preclude a recovery of damages, as we have held in different settings. See V.A.L. Floors, Inc. v. Westminster Communities, Inc., 355 N.J. Super. 416, 424 (App. Div. 2002) (quoting Inter Med. Supplies v. EBI Med. Sys., 181 F.3d 446, 463 (3d Cir. 1999)). That is, our courts have held at times that "mere uncertainty as to the amount [of damages] will not preclude the right of recovery." Tessmar v. Grosner, 23 N.J. 193, 203 (1957); see also Am. Sanitary Sales Co. v. State, Dep't of Treas., Div. of Purchase & Prop., 178 N.J. Super. 429, 435 (App. Div.), certif. denied, 87 N.J. 420 (1981). These authorities do not expressly hold that this looser standard would apply to a tortious interference with prospective economic advantage, and we need not determine here whether it should.

[50] Although not necessary for our disposition of this aspect of the appeal, we would further observe in the interest of completeness that we see no error in the judge's refusal to conduct a hearing regarding the admissibility of Elson's expert testimony. We agree that ordinarily the best practice would be for a trial judge to permit the examination of the scope of an expert's opinion — when its admissibility is challenged — at a pretrial N.J.R.E. 104(a) hearing. See Kemp ex rel. Wright v. State, 174 N.J. 412, 432 (2002). We see no error in the failure to conduct such a hearing here because Elson was examined at great length at his deposition about his methodology and that deposition testimony was available to and considered by the trial judge at the time of his ruling. We have no reason to believe — in light of the voluminous record on appeal — that a N.J.R.E. 104(a) hearing would have better amplified the disputes about his expert testimony; indeed, it seems to us that in this particular instance the efficient administration of justice would have been disserved if such a hearing were conducted.

A-0963-12T1

## THE CROSS–APPEALS

We turn to the cross-appeals filed by Morgan Keegan and the Exis defendants. Morgan Keegan argues that the trial judge erred in allowing plaintiffs to seek damages allegedly incurred by non-party subsidiaries and that the trial judge erred in denying Morgan Keegan's motion for summary judgment on First Amendment grounds.[51] We reject both these arguments.

### A. Standing

Morgan Keegan argues the trial judge erred in declining to dismiss plaintiffs' claims to the extent plaintiffs sought damages incurred by nonparty subsidiaries. Morgan Keegan asserts that three categories of damages were sustained not by Fairfax and C&F — the only named plaintiffs — but instead represent damages sustained by subsidiaries. Specifically, the argument focuses on plaintiffs' claim to: (1) $545 million in alleged lost profits related to insurance that would have been written by C&F's subsidiaries; (2) $805 million in alleged losses relating to the sale of stock held in the ICICI Bank and sold by

---

[51] The Exis defendants also filed a cross-appeal and have argued that the trial judge erred in denying their motion for summary judgment on the disparagement claim based on standing and statute of limitations grounds. The Exis defendants rely on the arguments thoroughly posed by Morgan Keegan on these issues.

Fairfax's subsidiary Hamblin Watsa Investment Counsel, Ltd.; and (3) $42 million in allegedly increased D&O liability insurance costs paid by Fairfax but reimbursed by its subsidiaries.

As we have already ruled, New York law applies and limits the damages available on the disparagement and tortious interference with prospective economic advantage claims to profits emanating from the alleged lost 180 customers. New York law does not permit recovery for collateral damages, such as the losses related to the sale of the ICICI stock or the increased cost of D&O insurance. We consider, therefore, the argument insofar as Morgan Keegan alleges the 180 customers were lost not by C&F but by its subsidiaries.

In this regard, Morgan Keegan argues that a parent corporation lacks standing to bring the claims of a subsidiary — regardless of whether New York or New Jersey law applies[52] — and that the trial judge erred in holding that material factual issues existed without identifying them, as Rule 4:46-3 requires. Morgan Keegan further argues that even if, as the trial judge stated, plaintiffs might have been entitled to other damages properly asserted, the trial court still should have

---

[52] There is no doubt, and no party has argued otherwise, that the law of the forum governs this question of standing. See Restatement (Second), supra, § 125.

granted partial summary judgment as to any damages sought on behalf of subsidiaries.

Plaintiffs respond that courts broadly construe standing and allow a plaintiff to assert a third party's rights if the plaintiff states a "sufficient personal stake and adverseness [to the defendant]." Jersey Shore Med. Ctr.-Fitkin Hosp. v. Estate of Baum, 84 N.J. 137, 144 (1980); Assocs. Commercial Corp. v. Langston, 236 N.J. Super. 236, 242 (App. Div.), certif. denied, 118 N.J. 225 (1989). Parent corporations have been held to meet that standard. Bondi, supra, 423 N.J. Super. at 436-37.

The judge explained the motion was denied in this regard because, in pertinent part, plaintiffs argued that C&F's subsidiaries' "losses are incorporated into C&F's consolidated financial statements, and moreover, C&F writes its insurance policies through its subsidiaries[,] [which] are wholly-owned by plaintiffs." The judge concluded:

> [E]ven if defendants' allegations are assumed to be accurate, there are still genuine issues of material fact with regard to whether plaintiffs have standing to pursue those actions on behalf of their subsidiaries . . . . Defendants' motion for summary judgment is not granted based on this rationale.

The denial of the summary judgment motion was warranted, based on the trial judge's sound reasoning and reliance on Bondi, which we discussed earlier. See Section IV(A)(3), supra.

A-0963-12T1

Briefly, the plaintiff Bondi was an administrator appointed by the Italian government to oversee the collapse of the Italian company Parmalat. The defendant Citigroup (Citi) asserted a counterclaim as to which Bondi claimed it lacked standing to pursue because the claims belonged to Citi's subsidiaries. Bondi, supra, 423 N.J. Super. at 436. We rejected that argument, finding Citi "was the operating agent for the transactions," the subsidiaries' business on the matter at issue "appeared on Citi consolidated financial statements, and all profits and losses flowed through Citi books. In short, any losses incurred by even one subsidiary was considered a loss of Citi funds." Ibid. We held "the evidence established that the funds loaned or extended to Parmalat all originated from Citi." Id. at 438. Citi had standing, therefore, because in New Jersey, "[a] financial interest in the outcome of litigation is ordinarily sufficient to confer standing." Ibid. (quoting Assocs. Commercial Corp., supra, 236 N.J. Super. at 242).

We agree this reasoning requires a rejection of Morgan Keegan's argument. We conclude, as to the alleged lost insurance profits suffered by C&F's insurance subsidiaries, there is merit to the trial judge's view that the effect on C&F's consolidated financial statements gave C&F a sufficient "financial interest in the outcome of litigation" to preclude a dismissal on

144                                                    A-0963-12T1

standing grounds. We find insufficient merit in Morgan Keegan's arguments on standing to warrant further discussion in a written opinion. R. 2:11-3(e)(1)(E).

## B. First Amendment Grounds

### 1. The Parties' Arguments

Morgan Keegan also argues that the trial judge erroneously applied First Amendment principles because "no reasonable jury could find by clear and convincing evidence that Morgan Keegan published any false factual assertion with actual malice — that is, with knowledge that it was false." Morgan Keegan argues that the actual-malice standard applies because "large corporations active in the public arena" like Fairfax and C&F are considered public figures, and the law affords greater protection for speech concerning public figures. It claims that despite more than 150 depositions and the production of more than 15,000,000 pages of documents, plaintiffs were unable to identify a single piece of evidence to support a contention that Morgan Keegan or its analyst, Gwynn, did not believe the statements they made were true. Morgan Keegan additionally argues that whether advance tipping was provided about their reporting is not probative as to whether they believed the information in the report was false. Morgan Keegan contends there was no evidence of an incentive to report falsely, and asserts that the fact

Gwynn's reporting contained an error in calculating Fairfax's reserve deficiency, which was promptly corrected, does not raise a fact issue as to the malice requirement.

In addition, Morgan Keegan contends the First Amendment provides absolute protection to "opinions that do not imply false facts" or that are "pure opinions" for which the factual basis is disclosed. It argues that because estimates about insurance company reserves are not verifiable, First Amendment analysis mandates a presumption that statements about reserves are protected because they are mere opinions. Morgan Keegan contends further that the trial judge misconstrued the nature of "context" in the First Amendment analysis; it claims that rather than referring to what was happening at the time of the statement, context refers only to how a reader would have interpreted the statement's content in view of the information disclosed. Based on the disclaimers in Morgan Keegan analyst reports, and with the underlying factual basis set forth, Morgan Keegan contends the context reinforced its position that Gwynn's statements were not actionable — that they were inherently subjective, completely protected "pure" opinions.

Plaintiffs respond that the trial judge's denial of the motion was entirely correct because genuine issues of material fact precluded summary judgment. Plaintiffs point out that

Morgan Keegan's collaboration and coordination in furtherance of the conspiracy went well beyond the statements in its reports, so the possibility of First Amendment protection for a limited number of statements provides no basis for dismissing Morgan Keegan as a defendant. Plaintiffs further set out several statements from the reports to support their contention that Morgan Keegan either knew or recklessly disregarded the truth. For example, plaintiffs contend Morgan Keegan admitted violating its own policies, and those of the New York Stock Exchange, because "it did not 'do a single thing' to determine whether its claims were true and/or [sic] reasonable" and its supervisory analyst provided no meaningful oversight. The First Amendment, they contend, does not protect such knowingly or recklessly false and misleading statements and, therefore, the trial judge properly denied Morgan Keegan's motion.

## 2. The Trial Judge's Decision

Relying on Romaine v. Kallinger, 109 N.J. 282 (1988), the trial judge held that where a statement is capable of more than one meaning, with only one being defamatory, "the question of whether its content is defamatory is one that must be resolved by the trier of fact." Although the judge acknowledged that the dispute presented a difficult question as to whether a statement's defamatory nature must be viewed solely within the

four corners of the report, or whether it could be considered within the broader context of the alleged conspiracy, the judge was satisfied that there were material issues of fact that required the motion's denial. For example, the judge determined that a fact issue remained whether Morgan Keegan disclosed to hedge fund investors the information contained in Gwynn's report prior to its actual release; in that case, even if the information was true, the release "probably [constituted] an illegal insider trading act," in which case, according to the judge, "maybe that's not protected."

The trial judge also relied on DeAngelis v. Hill, 180 N.J. 1 (2004), and Ward v. Zelikovsky, 136 N.J. 516 (1994), as support for the view that courts do consider context and "do not automatically decide a case on the literal meaning of a challenged statement." Consequently, the judge observed that "[c]ontext to me is also not just simply words on the paper but when it was said, how it was said, to whom it was said." Questions of fact, according to the trial judge, remained about whether Gwynn or Lawless correctly represented certain facts about Fairfax's financial condition, and the verifiability of those facts. The judge recognized that "[d]efendants want to have their reports characterized as pure opinion," but he

determined that "even pure opinion requires me to analyze the context of the matter and that's most troubling."

Ultimately, however, the judge never applied these principles to the parties' assertions. He recognized the questions posed were fact-sensitive but believed the process of determining whether the First Amendment afforded protection to Morgan Keegan was so "daunting" as to preclude the painstaking, statement-by-statement analysis, which the law requires, through what the judge referred to as "38 boxes" of materials.[53]

### 3. Our Holding

To be sure, our courts have held that the "summary judgment practice is particularly well-suited for the determination of libel [and defamation] actions" because those actions "tend to 'inhibit comment on matters of public concern.'" DeAngelis, supra, 180 N.J. at 12 (quoting Dairy Stores, supra, 104 N.J. at 157). This lion of a case, however, mocks those beliefs. Indeed, although the summary judgment procedure is favored in such

_____

[53] In his March 16, 2012 oral decision, the trial judge observed that "everybody agrees that the statement-by-statement analysis the [c]ourt must go through is an extremely-daunting task and I think it's an unreasonable — let me not say that, I think it's the kind of task — I don't want to put it that way either. I did go through the statements, I did — I did go through the reports, but for me to conclude that there's no[t] one element of lack of truth in those — in that record is, I don't think that's inappropriate — well, it's not that it's inappropriate, I can't do that, I can't make that finding."

A-0963-12T1

instances, that is chiefly so because putting a speaker or publisher through the discovery process could have a chilling effect on free speech. See Armstrong v. Simon & Schuster, Inc., 649 N.E.2d 825, 828 (N.Y. 1995). Considering the amount of discovery already taken here, it seems a little late in the day — maybe ten years late — to express concern for the chilling effect of litigation and discovery.

Moreover, the question is particularly elusive on appeal because the judge failed to engage in the process required by law. The statement-by-statement analysis that is required should not occur for the first time on appeal, and we decline to make an exception here.

We remand on this point for the trial judge to consider further the application of First Amendment principles to the disparagement claims asserted against Morgan Keegan and the Exis defendants.[54] Applied to a claim of disparagement, New York law would require a determination of whether any of the statements in question were "susceptible of a defamatory connotation,"

---

[54] These same First Amendment principles apply even if the claim does not sound in defamation but in some other theory of recovery. See, e.g., Hustler Magazine v. Falwell, 485 U.S. 46, 56, 108 S. Ct. 876, 882, 99 L. Ed. 2d 41, 52 (1988); Food Lion, Inc. v. Capital Cities/ABC, Inc., 194 F.3d 505, 522 (4th Cir. 1999); Hornberger v. Am. Broad. Cos., Inc., 351 N.J. Super. 577, 628-30 (App. Div. 2002); LoBiondo v. Schwartz, 323 N.J. Super. 391, 415-17 (App. Div.), certif. denied, 162 N.J. 488 (1999).

Davis v. Boeheim, 22 N.E.3d 999, 1003-04 (N.Y. 2014), as outlined in cases such as Thomas H. v. Paul B., 965 N.E.2d 939, 942 (N.Y. 2012) (for example, false statements "that tend[] to expose a person to public contempt, hatred, ridicule, aversion or disgrace"), and that the statements do not constitute "pure opinion," which would not be actionable because "[e]xpressions of opinion, as opposed to assertions of fact, are deemed privileged . . . no matter how offensive," Mann v. Abel, 885 N.E.2d 884, 885-86 (N.Y. 2008). Stated another way, no matter "how[] pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas." Steinhilber v. Alphonse, 501 N.E.2d 550, 552 (N.Y. 1986) (quoting Gertz v. Robert Welch, Inc., 418 U.S. 323, 339-40, 94 S. Ct. 2997, 3007, 41 L. Ed. 2d 789, 805 (1974)). And, "[w]hile a pure opinion cannot be the subject" of an actionable claim, Davis, supra, 22 N.E.3d at 1004, an opinion that "implies that it is based upon facts which justify the opinion but are unknown to those reading or hearing it, . . . is a 'mixed opinion' and is actionable." Steinhilber, supra, 501 N.E.2d at 552-53.

"What differentiates an actionable mixed opinion from a privileged, pure opinion is 'the implication that the speaker knows certain facts, unknown to [the] audience, which support

[the speaker's] opinion and are detrimental to the person' being discussed." Davis, supra, 22 N.E.3d at 1004 (quoting Steinhilber, supra, 501 N.E.2d at 553). For guidance in determining whether a reasonable reader would consider a statement as connoting facts or nonactionable opinions, New York law provides three factors: "(1) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false; and (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal . . . readers or listeners that what is being read or heard is likely to be opinion, not fact." Brian v. Richardson, 660 N.E.2d 1126, 1129 (N.Y. 1995). The third factor "lends both depth and difficulty to the analysis," ibid., and requires a consideration of "the content of the communication as a whole, its tone and apparent purpose." Davis, supra, 22 N.E.3d at 1005.

We would also add that Morgan Keegan's claim to summary judgment is impacted by whether plaintiffs can show that any false statements of fact were made with "malice," which would require evidence of actual knowledge or reckless disregard of a statement's falsity. Gertz, supra, 418 U.S. at 334, 94 S. Ct. at 2997, 41 L. Ed. 2d at 802. Whether a finding of actual malice

requires clear and convincing evidence or only a preponderance of the evidence depends upon whether plaintiffs are public figures, see Weldy v. Piedmont Airlines, 985 F.2d 57, 63-65 (2d Cir. 1993) (applying New York law); see also Masson v. New Yorker Magazine, 501 U.S. 496, 610, 111 S. Ct. 2419, 2429, 115 L. Ed. 2d 447, 468 (1991) (observing that "[w]hen . . . the plaintiff is a public figure, he cannot recover unless he proves by clear and convincing evidence that the defendant published the defamatory statement with actual malice"). Plaintiffs have not been clear about their position on this point; Morgan Keegan asserts that plaintiffs did not contest in the trial court that they are public figures.

The particular question of whether a business entity may be characterized as a public figure has proved vexing. See Dairy Stores, supra, 104 N.J. at 139. Courts have held that a corporation becomes a public figure when inviting reviews and by advertising extensively, Bose Corp. v. Consumers Union of U.S., Inc., 508 F. Supp. 1249, 1273 (D. Mass. 1981), rev'd on other grounds, 692 F.2d 189 (1st Cir. 1982), aff'd on other grounds, 466 U.S. 485, 104 S. Ct. 1949, 80 L. Ed. 2d 502 (1984), or when the corporation has "considerable access to the media" or "voluntar[il]y ent[ers] into a [public] controversy," United States Healthcare, Inc. v. Blue Cross of Greater Phila., 898

F.2d 914, 938 & n.29 (3d Cir. 1990). By way of example, in Reliance Ins. Co. v. Barron's, 442 F. Supp. 1341, 1348 (S.D.N.Y. 1977), the court held that an insurance company — regulated by state insurance law and required to file reports with the SEC — whose "shares [we]re traded on the New York Stock Exchange," possessed "more than a billion dollars in assets," and "offered to sell its stock to the public," had "voluntarily thrust[ed] itself into the public arena, at least as to all issues affecting that proposed stock sale," and was, therefore, to be treated as a public figure "with respect to issues involving its offering of securities to the public."[55]

There remains a lack of clarity since our Supreme Court expressed uncertainty about this thirty years ago. Dairy Stores, supra, 104 N.J. at 139 (recognizing "that the constitutional concepts do not comfortably fit the activities or products of a corporation"). But we need not delve further into this area. As noted above, plaintiffs may not have disputed the point. Moreover, the questions whether plaintiffs are public figures are not presently reviewable. Although we apply the same summary judgment standards that governed the trial judge, Townsend,

---

[55] Whether a corporation possesses fame and notoriety or seeks out attention raises questions as to whether it should be viewed as a general-purpose public figure or a limited-purpose public figure. See Steaks Unlimited v. Deaner, 623 F.2d 264, 273 (3d Cir. 1980).

<u>supra</u>, 221 <u>N.J.</u> at 59, and are required to examine the same materials that were presented to the trial judge, <u>Lombardi v. Masso</u>, 207 <u>N.J.</u> 517, 542 (2011); <u>Noren v. Heartland Payment Sys.</u>, __ <u>N.J. Super.</u> __, __ (App. Div. 2017) (slip op. at 3), we are not expected, in applying those principles, to canvass the record to determine whether plaintiffs' claims may be maintained against Morgan Keegan and the Exis defendants when the trial judge has not first undertaken this task. We certainly appreciate the size of the record and the burdensome nature of the task, but our procedures require that the effort first be exerted in the trial court.

## VI

## CONCLUSION

For these reasons, we affirm: the May 11, 2012 order which dismissed the RICO claims (counts one and two[56]); the December 23, 2011 order which dismissed in all respects as to defendants Kynikos, Third Point, Chanos, Perry and Loeb on personal jurisdiction grounds; the September 25, 2008 order which granted summary judgment in all respects in favor of Copper River Partners, David Rocker, and Rocker Partners, L.P.; that part of

---

[56] We refer in this paragraph to the counts as they appear in the third amended complaint.

the September 12, 2012 order that precluded Elson's expert testimony; and the August 14, 2012 order[57] that denied Morgan Keegan's motion for summary judgment. We reverse: the August 21, 2012 order, which determined that the disparagement claim (count three) and the tortious inference with prospective economic advantage claim (count five) were governed by New York's three-year statute of limitations; the September 12, 2011 order granting summary judgment in the SAC defendants' favor; and that part of the September 12, 2012 order that found the allegations concerning 180 lost customers to be inadequate.

Affirmed in part, reversed in part, and remanded for further proceedings, in conformity with this opinion, on the claims set forth in counts three, five, and six,[58] as they pertain to Morgan Keegan, S.A.C. Capital Management, S.A.C. Capital Advisors, S.A.C. Capital Associates, Sigma Capital Management, Steven A. Cohen, Exis Capital, Exis Capital Management, Exis Differential Partners, and Exis Integrated Partners.

We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[57] This order was mistakenly dated October 12, 2012.

[58] Count six alleges a civil conspiracy by all defendants. Because there are other maintainable tort causes of action, this civil conspiracy claim may also be maintained.

A-0963-12T1

# FAIRFAX SIMPLIFIED ORGANIZATIONAL CHART



Sources include: JA178259; JA152968-JA152974 charts as of December 31, 2001

A-0963-12T1